671 P.2d 1068

Ronald J. BEITELSPACHER, Gordon R. Hollifield, Dan Kelly, Patricia L. McDermott, and Harold W. Reid, Petitioners,

v.

James E. RISCH, President por tempore, and T.W. Stivers, Speaker of the House, Respondents.

No. 14957.

Supreme Court of Idaho.

Oct. 27, 1983.

M. Karl Shurtliff, Boise, for petitioners.

Jim Jones, Atty. Gen., Larry K. Harvey, Chief Deputy Atty. Gen., Boise, for respondents.

BAKES, Justice.

Petitioners ask that the Court make permanent an alternative writ of mandate previously granted requiring leaders of the state legislature to comply with a citizens' committee recommendation of legislative pay levels or show cause why they should not be required to comply. For the reasons stated herein, we quash the alternative writ.

Art. 3, § 23, of the Idaho Constitution provides for a citizens' committee on legislative compensation.[1] According to that provision, the committee must, on or before November 30, of every even-numbered year, set a rate of compensation for legislators. The rate set by the committee will be the rate of compensation unless, "prior to the 25th legislative day of the next regular session, by concurrent resolution, the senate and house of representatives shall reject or reduce such rates of compensation and expenses." On October 29, 1982, the commit-

---

1. [Art. 3] § 23. **Compensation of members.** —The legislature shall have no authority to establish the rate of its compensation and expense by law. There is hereby authorized the creation of the citizens committee on legislative compensation .... The committee shall, on or before the last day of November of each even-numbered year, establish the rate of compensation and expenses for services to be rendered by members of the legislature during the two-

year period commencing on the first day of December of such year.... The rates thus established shall be the rates applicable for the two-year period specified *unless prior to the twenty-fifth legislative day of the next regular session, by concurrent resolution, the senate and house of representatives shall reject or reduce such rates of compensation and expenses ...."* (Emphasis added.)

tee set rates of compensation for legislators sitting during, the 1983 and 1984 sessions. Thus, in order to reject that compensation the legislature was required to act on a concurrent resolution prior to the 25th day of the 1983 session. The 1983 session began January 10, 1983. A concurrent resolution (HCR 10), initiated in the House, sought to reject the compensation rates set by the committee. HCR 10 passed the House on January 27, 1983, and was sent to the Senate for approval. The resolution was then referred to the State Affairs Committee, and subsequently reported back out of committee on February 1, 1983, the 23rd legislative day, without recommendation. The resolution was held at the desk for one legislative day.

On February 2, 1983, the 24th legislative day, the Senate finally voted on HCR 10. The measure was passed. However, on that same day, notice was given, pursuant to Senate rules, that on the next day a motion to reconsider may be made. On February 3, 1983, the 25th legislative day, such a motion was made, but was rejected.

Several legislators then filed this petition for writ of mandate on February 23, 1983, asking this Court to order leaders of the House and Senate to pay members according to the committee recommendation, alleging that HCR 10 had not passed prior to the 25th legislative day. This Court, by order dated February 24, 1983, issued an alternative writ of mandate.

Thus, the narrow question presented in this case is the effective date of HCR 10. If it became effective on February 2, the 24th legislative day, then the citizens' committee recommendation was effectively rejected. However, if the notice of intent to move for reconsideration, given on the 24th day, and the subsequent making of the motion to reconsider on the 25th day, delayed the effectiveness of the vote on HCR 10 until the 25th legislative day or later, then the citizens' committee recommendation was not effectively rejected.

Both petitioners and respondents urge us to consider *Mason's* Manual of Legislative Procedure and the rules contained therein,

and to interpret and apply those rules to this situation. However, this would require the Court to interpret rules which govern parliamentary procedure in the legislature. This we decline to do in light of the fact that the Senate has already, through its leadership, interpreted the effect of its own rules. The Senate, as part of the legislature, is an independent branch of government. Our state Constitution, Art. 2, § 1, divides our government into three distinct departments and forbids members of one department, for example the judiciary, from exercising powers properly belonging to one of the other departments, such as the legislature. Art. 3, § 9, of our Constitution gives each house of the legislature the power to determine its own rules of proceeding. Thus, this power is specifically reserved to the legislative branch by the Constitution, and we cannot interfere with that power. The interpretation of internal procedural rules of the Senate is for the Senate. Its leadership has spoken, and the Senate as a whole has not overruled it.

Both Senate and House leadership, by signing the resolution and paying legislative members at the old rate, determined the effect of their own parliamentary rules on the passage of HCR 10 before the required time. Because the legislature has already determined the application of its own rules, we decline to intervene in the actions of that distinct branch of government.

Alternative writ quashed. Permanent writ denied.

DONALDSON, C.J., concurs.

SHEPARD and HUNTLEY, JJ., concur in result.

HUNTLEY, Justice, with whom SHEPARD, Justice, joins, concurring specially.

I concur in the result reached by the plurality, but would reach it by determining the merits of the issues raised on appeal.

In my view this is not a controversy over an issue limited to the power of the legislature to determine its own internal rules—

rather it is a case wherein certain legislators are asserting that the rulings of the leadership are depriving them of the remuneration to which they are entitled. Their only redress is through the courts and the courts of Idaho are not powerless to protect individual rights in cases of this nature.

The Senate Rules do not specifically provide an answer to the question of whether HCR 10 became effective on the 24th legislative day or on a later day. However, Senate Rule 48 does indicate that if a question is not dealt with by the Senate rules, then Mason's Manual of Legislative Procedure (hereinafter *Mason's*) will govern. Both parties cite to different sections in *Mason's* in an attempt to convince this court that the manual supports their respective positions. Petitioners cite *Mason's* § 737(6), and *Mason's*, § 467(1), which read as follows:

"Where a bill has been voted upon favorably by both houses, but a motion to reconsider its action in passing the bill is pending in the house last acting on the bill and the bill is still in its possession, it has not been finally passed by both houses." *Mason's,* § 737, para. 6.

"The effect of making the motion to reconsider, or of giving notice of the motion where that is the procedure, is to suspend all action on the subject of the motion until the reconsideration is acted upon." *Mason's,* § 467, para. 1.

However, § 737(6) only indicates the status of a bill where a motion to reconsider is still pending, but does not direct itself to the status of a bill after the motion for reconsideration is rejected. Similarly, § 467(1) indicates the status of a bill while the reconsideration is still pending. Neither of these sections address themselves to the circumstance involved in this appeal. Respondents cite *Mason's,* § 468(4), which reads:

"A legislative act is effective from the date the action is taken even though a motion to reconsider would still be in order at an adjourned meeting. Reconsideration, during the time a motion to reconsider may be made, is only a contin-

gent right and does not postpone the effectiveness of the original action. Where a city council took an action which carried a penalty and adjourned the meeting to a later date, any person violating the act was subject to the penalty of the act even though the original act was still subject to reconsideration." *Mason's,* § 468, para. 4.

Again, this section of Mason's does not answer the question before us. That section only addresses the status of a legislative act before a motion to reconsider is even made and, apparently, even before a notice of a motion to reconsider is made. It does not address the situation where a motion for reconsideration has already been made.

*Mason's* does, however, indicate its sources of parliamentary law and precedence, indicating to us where we should turn when the manual itself does not govern the situation presented. The sources, as indicated in *Mason's,* § 4, p. 38, are:

"a. Constitutional rules.

b. Fundamental legal principles, see Sec. 22–3.

c. Statutory rules or charter provisions (as to local bodies).

d. Adopted rules.

e. Adopted parliamentary authority.

f. Parliamentary law.

g. Customs and usages.

h. Judicial decisions."

These sources take precedence in the order listed above. *Mason's,* § 4, p. 38. Since the first five sources do not resolve the question before us, we turn to noted sources of parliamentary law, the sixth source listed by *Mason's.* One noted authority on parliamentary law is Robert's Rules of Order, Newly Revised (1979). In *Robert's,* we find a clear answer to our question.

"If a motion to *Reconsider* is voted on and lost, the vote which it proposed to reconsider, and any action held up because of the proposed reconsideration, comes into full force, effective from the time the first vote was taken." § 36, p. 27.

This section clearly indicates that if the motion to reconsider is defeated, the act itself relates back to the day the first vote is taken. This rule is applicable to the case at bar. The result might be otherwise if a motion to reconsider passed but upon later reconsideration was passed or defeated by the same vote as it originally received. Since the motion to reconsider failed, that question is not before us.

HCR 10, having initially passed on the 24th legislative day, and its effectiveness relating back to that day after the motion to reconsider was lost, effectively rejected the citizens' committee recommendation and the legislative leaders correctly interpreted the amount of pay due legislators. Thus, the alternative writ must be quashed and the permanent writ denied.

BISTLINE, Justice, concurring and dissenting.

The petitioners quote two passages from *United States v. Smith*, 286 U.S. 6, 52 S.Ct. 475, 76 L.Ed. 954 (1932), which, although disregarded by the other members of the Court, to my mind are controlling in resolving this controversy where, absent consideration of those passages, we have two stalemated plurality opinions. Justice Brandeis authored the opinion to which I refer, and if not controlling, it should be persuasive with this Court or any court which maintains a regard for precedent and for judicial wisdom. Justice Brandeis wrote for a unanimous court; he wrote on exactly the same issue which has been placed before us.

The first passage puts to rest the respondents' contention that we are not presented with a justiciable controversy. Justice Brandeis wrote: "As the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one." 286 U.S. at 33, 52 S.Ct. at 478. The ques-

tion presented to us, too, affects persons other than members of the Senate, as is readily demonstrable.

The 1976 amendment to art. 3, § 23 of the Idaho Constitution introduced into our form of government the Citizens Committee on Legislative Compensation. The Citizens Committee which was created by the 1976 amendment became as much a constitutional body as is the legislature itself. To it was entrusted the sole authority to set legislative salaries, although art. 3, § 23 provides a manner in which the legislature can effectively override the considered determination arrived at by the Citizens Committee, thus rendering ineffective the Committee's very function. So viewed, there are here, as in *United States v. Smith, supra,* persons affected other than members of the Senate. Not only affected are the six persons who comprise the Committee, but likewise legislators and families of legislators, and a great number of the electorate who understand the reasons for taking from the legislature the setting of its own pay and expenses—and see the wisdom of the policy. In essence, the claim here made by the petitioners is the same challenge which it seems rather apparent the Citizens Committee, on behalf of the citizenry which the Committee represents, could also have mounted. There is certainly more at stake here than those dollars (my own hasty computation indicates an increase of approximately $70.00 to $80.00 per month) which will inure to the benefit of the four petitioners who have seen fit to obtain a judicial determination. Rather a far larger concern, and one which would be foremost in the minds of the Citizens Committee, is the desirability of maintaining a level of compensation and expenses which will attract and enable highly qualified but non-affluent people to public service.[1]

---

1. Mr. de Tocqueville in writing of what he called the tyranny of the majority, *Democracy in America,* beginning at page 280 said: "I am inclined to attribute the singular paucity of distinguished political characters to the ever-increasing activity of the despotism of the majority in the United States." *Id.* at 287. One

would like to think that those legislators in the majority would choose to turn back so much of the Committee's established rate that they personally either did not need or thought excessive, rather than to reject it to the disadvantage of those who felt the need of the increase.

The second passage written by Justice Brandeis is extremely appropriate to the justiciable controversy here presented:

"In deciding the issue, the Court must give great weight to the Senate's present construction of its own rules; but so far, at least, as that construction was arrived at *subsequent* to the events in controversy, we are not concluded by it."

286 U.S. at 33, 52 S.Ct. at 478 (emphasis added).

With that language in mind, it is beyond cavil that prior to the instant controversy the Senate had not ever been called upon to make an interpretation of its own rules with regard to the effect of a motion for reconsideration. It is as equally true that here it had not done so. All that is true is that following the initiation of the instant action, the named respondents have taken the position that defeat of a motion for reconsideration wipes the slate clean, and that upon the defeat of the motion for reconsideration, the concurrent resolution, joint resolution, or bill, as the case may be, the effective date is said to be the prior day by application of the doctrine of relation back even though its effectivity on the prior day had been precluded by the motion for reconsideration. This, however, is exactly the after-the-fact determination referred to by Justice Brandeis. There was no such determination made by the Senate or its presiding officer prior to the returning of the Resolution to the House. It becomes necessary to pause and review the course of pleadings and briefs in this Court.

The Petition for Writ of Mandate makes it abundantly clear that the proceeding is not against the Senate itself, but against Mr. Risch and Mr. Stivers in their official capacities, respectively President Pro Tem of the Senate and speaker of the House, and is based on alleged failure to perform their duties:

"VIII.

"That the President Pro Tempore of the Idaho State Senate and the Speaker of the House of Representatives have, inter alia, the responsibility and the obligation to instruct the payroll clerks of the Idaho State Senate and the Idaho House of Representatives as to the appropriate levels of compensation and expenses which ought be paid to members of the Legislature by warrants issued by the State Auditor.

"IX.

"That Petitioners have demanded the Respondents instruct the payroll clerks of the Idaho State Senate and the Idaho House of Representatives to request warrants for compensation and expenses from the State Auditor at the levels established by the October 29, 1982 action of the Citizens' Committee on Legislative Compensation and Respondents have refused, neglected and failed to do so.

"X.

"That the Petitioners have a clear legal right to receive compensation and expenses as provided by law; conversely the Respondents have a clear legal duty to assure that Petitioners receive compensation and expenses as provided by law."

Petition for Writ of Mandate, p. 3.

Respondents in answering the petition made a left-handed concession that the Senate had not passed on its Rules as applied to this particular situation:

"V.

"In answer to paragraph IX, respondents admit that they have been informally asked by petitioners to make payment according to the schedule recommended by the Citizen Committee on Legislative Compensation but have not received a formal demand to do so. Nor have petitioners sought from either the House or Senate a formal interpretation of the rules upon which respondents base their determination that the levels of compensation recommended by the Citizens Committee on Legislative Compensation were rejected,"

Respondent's Answer, p. 2, and asserted two affirmative defenses:

"I.

"This issue is not justiciable as it involves the determination of a political question not appropriate for judicial consideration.

"II.

"By virtue of art. II, § 1 and art. III, § 9 of the Idaho Constitution, this Court cannot enter an order granting the relief prayed for in Petitioners' Petition."

Respondent's Answer, p. 3.

Respondents' brief filed with their Answer frankly concedes that the Respondents, Mr. Risch of the Senate and Mr. Stivers of the House—not to be confused with the Senate itself—reached a conclusion that the Resolution "was finally passed on the twenty-fourth day:

"Respondents have relied upon senate rules governing the procedure of the state senate and have concluded that according to those rules HCR 10 was finally passed on the twenty-fourth legislative day. Although there is no senate rule which squarely indicates when a resolution is considered to be finally acted upon when a motion to reconsider has been made, senate rule 48 states:

'In all cases not herein provided for, and in which they are not inconsistent with the joint rules of the senate and house of representative, the general rules of parliamentary practice and procedure as set forth in *Mason's Manual of Legislative Procedure* shall govern the proceedings of the senate.'

"Section 468(4) of *Mason's Manual* states in relevant part:

'A legislative act is effective from the date the action is taken even though a motion to reconsider would still be in order at an adjourned meeting. Reconsideration, during the time a motion to reconsider may be made, is only a contingent right and does not postpone the effectiveness of the original action.'

As this provision directly addresses the question and compels a conclusion that HCR 10 was approved in the senate on the twenty-fourth legislative day thereby having the effect of rejecting the recommendations of the Citizens Committee on Legislative Compensation, Respondents directed the payroll clerks of their respective houses to make disbursements for legislative pay and expenses according to the schedules which were in effect for the previous session, as required by art. III, § 23."

Brief in Support of Respondents' Answer, pp. 2–3.

That brief contains no claim that *Robert's Rules* is dispositive, and it is in fact not cited. In a supplemental brief filed shortly before oral argument, the respondents did turn to *Robert's Rules,* and therein urge the employment of the doctrine of relation back to uphold their contention that the Resolution was effective on the twenty-fourth day.

As the plurality opinion authored by Justice Huntley correctly points out, and as both parties agree, "The Senate rules do not specifically provide an answer to the question of whether HCR 10 became effective on the 24th legislative day or on a later day." The really crucial point, however, goes deeper. The question is, did the Senate ever reach the question? Did it, as an assembled body, ever hear its President make a ruling, and go through the appeal process as Senate Rule 41 contemplates, and reach a decision by the Senate itself? Both questions are answered in the negative. The Senate leadership, as Justice Bakes calls it in his plurality opinion, simply took the bull by the horns, and returned the resolution to the House. It was in the House, and only in that body, that the Speaker of the House, Mr. Stivers, implicitly took it upon his office to pass upon the proceedings of the Senate, asked to do so by Representative McDermott. None of the other opinions address this proposition, from which it is to be properly surmised that no justice recognizes any validity to

the Speaker's ruling on a matter of procedure in the Senate.

*Had* the question come before the Senate for a determination by it, and *had* the Senate by a majority vote resolved the procedural question before it, then there would have been a Senate determination of the construction, interpretation, or perhaps, a precedential creation, of Senate Rules of Procedure. Not only would we be bound by it, but this controversy would not have arisen, other than to examine the constitutionality of such a rule.

However, the Senate did not so address itself, and the controversy is before us. Unlike the situation in *United States v. Smith,* there still has not been such a determination by the Senate. We are well-informed by the named respondents, Mr. Stivers and Mr. Risch, both respectively in their official capacities as Speaker of the House and President Pro Tem of the Senate, of their views—which they ask that we adopt. Without doubt their views are entitled to some deference. But the majority fails to address the question of the extent to which this Court ought to yield to those two individual views—which we do not have, and has not as yet been rendered. Had it been rendered while the Senate was still in session—which very easily could have been the case, this action having been filed in this Court on the 23rd day of February, 1983, 50 days before the Senate's adjournment on April 14, 1983—this Court would be obliged to "give great weight to the Senate's present construction of its own rules" even though "that construction was arrived at subsequent to the events in controversy." *United States v. Smith,* 286 U.S. at 33, 52 S.Ct. at 478.

Justice Huntley in his opinion points to *Mason's,* §§ 737(6) and 464(i) for the proposition that a bill (resolution) has not been passed, even though favorably voted upon, where it is still in the possession of (here the Senate) and lays at the secretary's desk in a state of suspension which has been occasioned by a motion for reconsideration. Justice Huntley says of this that a shortcoming of these sections of *Mason* is that

they do not address the status of a bill (resolution) after the motion is voted down. Discussing *Mason's,* § 468(4), Justice Huntley concludes that it does not answer the question before us.

From there he observes himself finding help in *Mason's* § 4:

"**Sec. 4. Sources of Rules of Procedure**

"1. Rules of legislative procedure are derived from several sources. The principal sources are as follows:

"a. Constitutional rules.

"b. Fundamental legal principles, see Sec. 22–3.

"c. Statutory rules or charter provisions (as to local bodies).

"d. Adopted rules.

"e. Adopted parliamentary authority.

"f. Parliamentary law.

"g. Customs and usages.

"h. Judicial decisions.

"2. The rules from the different sources take precedence in the order listed above except that judicial decisions, to the extent they are interpretations of rules from one of the other sources, take the same precedence as the source interpreted. Thus, for example, an interpretation of a constitutional provision takes precedence over a statute.

"3. Whenever there is conflict between rules from these sources the rule from the source listed earlier prevails over the rule from the source listed later. Thus, where the constitution requires three readings of bills, this provision controls over any provision of statute, adopted rules, adopted manual, or of parliamentary law, and a rule of parliamentary law controls over a local usage but must give way to any rule from a higher source of authority.

"4. The term 'Parliamentary Law' is sometimes used in two different senses. It applies to rules having two different priorities. Certain indispensable basic principles such as the requirement of a meeting, a quorum, or a majority vote apply to all groups, in all instances, and without adoption, superseding adopted

rules and even statutes while other rules, sometimes also called parliamentary law, are mere custom and give way to adopted rules and apply only when the assembly has not adopted any contrary rule or practice. It is often necessary to determine in which sense the term is used.

"5. There is reason for every form of parliamentary procedure which has been long sanctioned by general usage. There is a reason, readily apparent for almost every one of them. They have been approved by experience, found useful and expedient in practice and have grown into general acceptance."

The senate has adopted its own set of rules of procedure, and in conjunction with the House has adopted Joint Rules of the Legislature. The Senate has also provided that in all cases not provided for in its Rules, it will turn to *Mason's* manual:

> **Matters Not Covered by Rules.**—In all cases not herein provided for, and in which they are not inconsistent with these rules or the joint rules of the Senate and House of Representatives, the general rules of parliamentary practice and procedure as set forth in Mason's Manual of Legislative Procedure shall govern the proceedings of the Senate."

Rules of the Senate, Rule 48.

Thus, it is seen that the Senate turns first to its own rules, and if need be, then to *Mason's* manual, respectively items d and e set forth in *Mason's* Manual in § 4 Item e is clearly "adopted parliamentary authority." Rule 48 so provides. *Robert's Rules of Order* clearly is not parliamentary authority adopted by the Senate, although we were told at oral argument that the House had adopted *Robert's Rules* as governing where its own adopted rules did not provide for a given case. Although Justice Huntley's opinion correctly concludes that items a, b, c, d, and e of § 1(1) do not furnish an answer to the controversy placed before us, he erroneously fails to see any distinction between the "Parliamentary law" of item e and what he calls "*sources* of parliamentary law." What *Mason's* manual actually states is that "*Rules* of legislative procedures are

derived from several sources." It is not the *sources* which take precedence, but the *rules* which take precedence. With respect to parliamentary law, it is the *rules* of parliamentary law which are sixth in precedence according to *Mason's* manual. *Mason's* manual makes it abundantly clear that it is not itself parliamentary law, but rather may be, as is true here by reason of Senate Rule 48, adopted parliamentary authority (item e of § 4(1)). *Mason's* manual not only declares itself to be a manual, absent adoption, but at page 7 in introduction says the same of *Robert's Rules of Order:*

**"Do Parliamentary Books Always State Parliamentary Law?**

"There has been controversy as to whether the rules of parliamentary procedure as stated in parliamentary books are really the rules of parliamentary law which will be enforced by the courts or whether they are only the opinions of the authors. Since Robert's Rules of Order has been followed by many other authors, whether Mr. Robert's book is law or not becomes important. Mr. Robert has himself answered this question for us.

"The foreword of Robert's book entitled *Parliamentary Practice* published in 1923, begins with the following statement by Mr. Robert.

" 'Robert's Rules of Order was published forty-five years ago with a view of furnishing a set of rules that any assembly might adopt, and thus avoid waste of time in constant discussion of what is parliamentary law in particular cases.'

It will be noticed from this clear statement by Mr. Robert, himself, that his rules were not a statement of parliamentary law but were 'a set of rules that any assembly might adopt' and that their purpose was 'to avoid waste of time', and how waste time?—'in constant discussion of what is parliamentary law in particular cases.' This statement makes it clear that Mr. Robert's rules were not even intended to state parliamentary law, but were, on the contrary, something that might be adopted to avoid the need of determining what was parliamentary

law. The trouble with this philosophy is that the law cannot be ignored but applies regardless. Trying to disregard parliamentary law is like ignoring a summons or subpoena, it only delays and adds complications."

What *Mason's* manual states is that parliamentary law is one of eight sources of parliamentary rules of procedure. Within the confines of § 4 itself, the manual sees a need to give a short explanation of what is encompassed by the term "parliamentary law":

"4. The term 'Parliamentary Law' is sometimes used in two different senses. It applies to rules having two different priorities. Certain indispensable basic principles such as the requirement of a meeting, a quorum, or a majority vote apply to all groups, in all instances, and without adoption, superseding adopted rules and even statutes while other rules, sometimes also called parliamentary law, are mere custom and give way to adopted rules and apply only when the assembly has not adopted any contrary rule or practice. It is often necessary to determine in which sense the term is used."
*Mason's,* p. 38.

Nowhere in that passage is even the slightest intimation that "noted sources of parliamentary authority" are encompassed therein. On the contrary, parliamentary authority *which has been adopted* is a separate source of rules, in priority ahead of parliamentary law and behind a body's own adopted rules. Moreover, adopted parliamentary authority is treated in a short chapter of the manual. Parliamentary law is another chapter, the first section of which is:

"Sec. 35. Parliamentary Law Defined.

"1. Parliamentary law consists of the recognized rules, precedents and usages of legislative and administrative bodies by which their procedure is regulated. It is that system of rules and precedents which originated in the British Parliament and which has been developed by legislative or deliberative bodies in this and other countries.

"2. Parliamentary law, like the common law, is an organized system of rules. It is built on precedents created by decisions on points of order or appeals, and by decisions of courts. It has been guided in its development by the authority to make rules inherent in every deliberative body.

"3. The common law of parliamentary procedure is founded upon well established and reasonable usage. It does not rest upon mere custom, but upon reasonable and equitable custom. 'What is not reason is not law' may be said with reference to the common law of order in deliberative bodies, as well as to the common law of the land.

"4. The parliamentary law is the rule of action for all deliberative bodies governing the introduction, modification, discussion and decision of propositions."
*Mason's,* p. 59.

The manual also declares the applicability of parliamentary law and with great specificity details its sources:

"Sec. 37. Parliamentary Law Governs When Other Rules Are Not in Effect

"1. All matters of procedure not governed by constitutional provisions, adopted rules, including joint rules, or an adopted manual, are governed by the rules of the general parliamentary law. The rules constituting parliamentary law having their foundation in convenience and necessity have been uniformly received and acted upon in this country as the governing authority. Parliamentary law has been universally acknowledged as controlling the procedure of legislative and other governmental bodies.

"2. Under parliamentary law a legislative or administrative body, when established, becomes vested with all the powers and privileges necessary to a free and unrestricted exercise of its appropriate functions, except so far as it may be restrained by express constitutional provisions or laws made pursuant thereto.

"3. When special rules of procedures have been adopted by a deliberative body, its procedure is controlled by such rules only insofar as they apply and otherwise

it is governed by general parliamentary law.

"4. The common parliamentary principles and rules may be resorted to in the absence of rules made by the organization itself in regulating its proceedings.

"5. Where matters of procedure are not covered by bylaws or rules, the procedure should follow parliamentary principles. Gaps in the rules of procedures should be filled by the adoption of fair methods according to accepted parliamentary principles.

"Sec. 38. Source of Parliamentary Law

"1. Parliamentary law gets its name and basic principles from the Parliament of Great Britain. It was brought to the colonies with the common law and other political institutions of England. Jefferson as presiding officer of the Senate looked to the procedure of Parliament as his guide and prepared his manual from English precedents. The state legislatures and local governmental bodies copied from Congress. But the procedure of the state legislatures, local legislative bodies and voluntary associations now differs greatly from the procedure of Parliament and Congress. While Congress is governed largely by rules adopted by the houses of Congress to meet their local and special needs, the state legislatures and particularly the more local bodies both public and private are governed by a branch of common law based on court decisions, and upon precedents and customs of deliberative bodies. There are some important differences between Parliamentary Law as applied in public bodies and as applied in voluntary associations."

*Mason's,* pp. 61–62.

*Robert's Rules* are thus seen as not being a source of parliamentary law. On the contrary, *Robert's Rules* is, as is so with *Mason's* manual, a manual in which one will find explanations and definitions of parliamentary law, and a history of its origin, enlightening excerpts of which are:

"Introduction

"This book embodies a codification of the present-day general parliamentary law (omitting provisions having no application outside legislative bodies). The book is also designed as a manual to be adopted by organizations or assemblies as their parliamentary authority. When the manual has been thus adopted, the rules within it, together with any special rules of procedure that may also be adopted, are binding upon the body and constitute that body's rules of order.

"*Parliamentary law* originally was the name given to the rules and customs for carrying on business in the English Parliament which were developed through a continuing process of decisions and precedents somewhat like the growth of the common law. These rules and customs, as brought to America with the settling of the New World, became the basic substance from which the practice of legislative bodies in the United States evolved. Out of early American legislative procedure and paralleling it in further development has come the *general parliamentary law,* or *common parliamentary law,* of today, which is adapted to the needs of organizations and assemblies of widely differing purposes and conditions. In legislative bodies, there is often recourse to the general parliamentary law in situations not covered by the rules or precedents of the particular body—although some of the necessary procedure in such a case must be proper to that type of assembly alone.

"The kind of gathering in which parliamentary law is applicable is known as a *deliberative assembly.* This expression was used by Edmund Burke to describe the English Parliament, in a speech to the electorate at Bristol in 1774; and it became the basic term for a body of persons meeting (under conditions detailed on p. 1) to discuss and determine upon common action.

"Acting under the general parliamentary law, any deliberative assembly can formally adopt written rules of procedure which, as fully explained on pages 12ff.,

can confirm, add to, or deviate from parliamentary law itself. As indicated above, the term *rules of order,* in its proper sense, refers to any written parliamentary rules so adopted, whether they are contained in a manual or have been specially composed by the adopting body. The term *parliamentary procedure,* although frequently used synonymously with *parliamentary law,* refers in this book to parliamentary law as it is followed in any given assembly or organization, *together with* whatever rules of order the body may have adopted.

"Thomas Jefferson speaks of 'the Parliamentary branch of the law.' From this country's beginning, it has been an underlying assumption of our culture that what has been authoritatively established as parliamentary law is *law*—in the sense of being binding within all assemblies except as they may adopt special rules varying from the general parliamentary law. But since there has not always been complete agreement as to what constitutes parliamentary law, no society or assembly should attempt to transact business without having adopted some standard manual on the subject as its authority in all cases not covered by its own special rules."

. . . .

" 'The proceedings of Parliament in ancient times, and for a long while,' Thomas Jefferson wrote more than four and a half centuries later (in the preface to his famous *Manual,* discussed below), 'were crude, multiform, and embarrassing. They have been, however, constantly advancing toward uniformity and accuracy. . . .' "

. . . .

"But the parliamentary system of the young United States needed further codification. As presiding officer of the Senate while serving as Vice-President of the United States (1797–1801), Thomas Jefferson saw this need, which he described—with respect to the situation in the Senate—in this way: *

'The Constitution of the United States . . . authorizes each branch of [the Congress] "to determine the rules of its own proceedings." The Senate has accordingly formed some rules for its own government; but these going only to few cases, it has referred to the decision of its President, without debate and without appeal, all questions of order arising either under its own rules or where it has provided none. This places under the discretion of the President [of the Senate] a very extensive field of decision . . . which—irregularly exercised—would have a powerful effect on the proceedings and determinations . . . . The President must feel . . . the necessity of recurring . . . to some known system of rules . . . . But to what system . . . is he to recur, as supplementary to [the Rules] of the Senate?'

"Parliament, Jefferson concluded, provided the most practical model for the Congress. It had 'served as a prototype to most of' the existing state legislatures. It was 'the model which we have all studied, while we are little acquainted with the modifications of it in our several states . . . . Its rules are probably as wisely constructed for governing the debates of a deliberative body, and obtaining its true sense, as any which can become known to us . . . .

" 'Considering, therefore, the law of proceedings in the Senate as composed of the precepts of the Constitution, the regulations of the Senate, and, where these are silent, of the rules of Parliament,' Jefferson compiled his *Manual of Parliamentary Practice,* published in 1801. In it he extensively cited about fifty English works and documents on parliamentary law and related subjects. Among his sources, however, Jefferson in his preface to his *Manual* acknowledges primary indebtedness to *Precedents of Proceedings in the House of Commons* by John Hatsell, who was clerk of the House of Commons from 1768 to 1820. First published in 1781, Hatsell's work is today the best authority on eighteenth-century procedure in the House of Commons.

"The position of *Jefferson's Manual* is unchallenged as the first to define and interpret parliamentary principles for our democratic republic and to offer a basic pattern of rules and a measure of uniformity for legislative processes of the United States. The authority of the *Manual* became established through its adoption by the Senate, by state legislatures, and by other groups. The House Representatives also adopted *Jefferson's Manual*; however, differences between the House and the Senate would cause the House to develop and become governed by a separate body of rules and practices largely superseding Jefferson's work."

---

\* In the preface to *Jefferson's Manual.*

*Robert's Rules of Order,* pp. xxvii–xxxv. While it is true that *Robert's Rules* does contain the statement which Justice Huntley sets forth in his opinion, such does not classify as parliamentary law. To the contrary, it is apparently nothing but that author's own view, there being in Mr. Robert's manual nothing from which it can be inferred that his view was based upon any precedent whatever. The Senate is certainly free to incorporate that view and make it into a specific rule, but it has never done so, and certainly the Senate, as a body, was not looking at *Robert's Rules* when it delayed voting on the Resolution until the twenty-fourth day, full well chargeable with the knowledge that, unlike the House, it could not vote on a motion for reconsideration until the day following.

Nevertheless and notwithstanding, Justice Huntley is willing to yield to the short passage in *Robert's Rules,* and to that passage apply the doctrine of "relation back." In his view, by application of that doctrine "the legislative leaders [2] correctly interpreted the amount of pay due legislators." The record simply does not sustain that assertion. It appears that the respondents' attorneys did further considerable research and so concluded just before oral argument.

Moreover, the doctrine of relation back is a fiction of the law, by which an act done today is considered to have been done at an earlier time. Legal fictions are nonetheless fictions—they are not facts. For the very reason that it is a fiction, legal fictions have found their way into the law in very few instances, one of which is the doctrine of equitable conversion, and another being the legal theory that delivery of an escrowed deed is accepted as delivered on the date the deed was executed. There appear to be no reported cases where the legal fiction has been invoked by a court in order to say that a legislative act was wholly effective on the day *prior* to its actually becoming effective. Should this high court be the first to create and utilize a new legal fiction in order to uphold "leadership"? I think not.

A short tour through Black's Law Dictionary strongly suggests that this Court ought not for the first time allow itself to indulge in legal fictions in settling this important controversy:

> **"Fictio juris non est ubi veritas.** Where truth is, fiction of law does not exist.
> **"Fictio legis inique operatur alicui damnum vel injuriam.** Fiction of law is wrongful if it works loss or injury to anyone.
> **"Fiction of law.** An assumption or supposition of law that something which is or may be false is true, or that a state of facts exists which has never really taken place."

If there be a precedent for applying a legal fiction to defeat a constitutional provision, I am unable to find it. It is the constitution which declares that the rate of compensation and expenses set by the Citizens Committee shall be the rate at which the legislators shall be paid for the ensuing two years. Such is not a recommendation, but a determination by a constitutionally created body.

---

**2.** It is not known whom this broad reference is intended to cover. There was no problem in House proceedings. Simply put, neither the Senate chair nor that assembly itself ever considered the question, thought themselves resolving it by turning to *Robert's Rules,* or entertained the belief that they could turn to *Robert's Rules.*

*Cf., Idaho Power Co. v. State,* 104 Idaho 570, 661 P.2d 736 (1983). Only in the event the legislature passes a concurrent resolution prior to the twenty-fifth day of its ensuing session reducing or rejecting can that determination of the Citizens Committee be made ineffective. It is inconceivable that the people of Idaho in adopting the 1976 amendment had in mind that some unknown and unheralded legal fiction could be invoked to extend the legislature's time beyond twenty-four days. One hardly need but point to the statutorily required publications favoring the adoption—which the people found persuasive in ratifying the proposed amendment:

"Statement FOR the proposed amendment:

"1. Legislative compensation is presently established at $10 per day, limited to 60 days for a regular session and 20 days for a special session. This rate was established in 1946, and can only be changed by constitutional amendment. It is unrealistic to bind the Legislature in 1976 or some future Legislature to a figure established 30 years or more ago. The rate of inflation, the changing needs of our society, and the demands placed upon members of the Legislature argue for greater flexibility in establishing the rate of compensation.

"2. *H.J.R. 6 would remove authority to increase rates of legislative compensation from the realm of the Legislature.* In the past, legislators have been very conservative in providing an adequate expense allowance, but even then have been open to the charge that they are adopting legislation with a direct personal interest.

*The provisions of this amendment would remove the initial salary review from legislative hands and return them to the people.*

"3. The present provisions of the Constitution have led to use of an expense allowance. While the salary is firmly established, the Legislature has followed the trend in other states and has provided an expense allowance to make up some of the difference between the salary and the actual cost of serving. While expense allowances have been held to be completely legal, it would be better to establish a clear public record of compensation for legislative service.

"4. Most proponents believe that the amendment will result in increased compensation for legislators, and approve of this because of the belief that *persons should be able to serve in the Legislature without undue hardship.* While legislative service should not become a highly paid government position, *compensation should be established at such a rate as to allow a true cross section of Idaho citizens to serve.* Only when all persons are eligible can Idaho claim to have a true citizens Legislature.

"5. The citizens committee created by this proposal is removed from the political arena by providing that no member may be a current office holder. The citizens of Idaho can have confidence that this committee, composed of persons like themselves, will be representative of Idaho thinking." Statement of Meaning and Purpose of The Proposed Constitutional Amendment Offered by House Joint Resolution Number 6, pp. 2–3.[3]

---

**3.** In 1968 Keefe and Ogul, in their volume on *The American Legislative Process* made these statements which may have prompted the initiation of the 1976 amendment:

"If here and there some state legislators are under the thumb of lobbyists who buy their meals and drinks or otherwise favor them, or of interest groups which place them on their payrolls in the interim between sessions, should such wayward confidence prove astonishing? If the legislatures are failing to attract individuals of unusual merit, if they are unable to retain most members of more

than one or a few sessions, if they are low on imagination and seldom the authors of bold and original proposals—the familiar assertions—is there reason to believe that inadequate salaries have something to do with it? The burden of the evidence, it has seemed to many observers, warrants such an inference.

"What constitutes a reasonable standard of remuneration for state legislators is difficult to decide for many reasons, not the least of which are the variations between the states in length and frequency of sessions and in the demands of the job during and between ses-

The constitution, per the 1976 amendment, does allow the legislature to override the pay and expenses as set by the Committee if, and only if, it does so by a deadline which is that the Resolution so doing must be effective prior to the twenty-fifth day. Are we, the members of the Court of last resort in Idaho, to allow circumvention of the Constitution by resort to a legal fiction? The four members of the Court who say yes are not only clearly wrong, but even the manuals upon which they thought to bring about such an absurd aberration tell them so. Assuming arguendo that it was the Senate which before-the-fact made the decisional ruling which Justice Huntley has written, could the Court properly sustain it? "No," says *Mason's* manual:

> "10. *To be valid any action or decision of a body must not violate any applicable law or constitutional provision* (Secs. 2–4). The decision making procedures of any body must comply with the applicable provisions of any local, state or Federal law. It is governed by any statutory or court made law including provisions of constitutions and charters."

*Mason's* at 5.

Other than for indulging in a pure fiction can it be said that prior to the twenty-fifth day the legislative action had *effectively* overridden the action of the constitutional Committee? Quaere: If the override was *actually* effective prior to the twenty-fifth day, then on what basis was it that the Senate was still dealing with the Resolution on the twenty-fifth day? As a matter of constitutional law, and as pointed out in *Mason's* manual, the constitution controls. Even had both houses of the legislature promulgated a joint written rule that by the doctrine of relation back all bills once passed are deemed to be effective from the first day of the session, or from the date of

introduction, although I would not argue that they could not do as a matter within the province of the legislature, it could never be that any such rule would stand up against art. 3, § 23, or any other provision of the constitution.

In conclusion, concurring with that much of the plurality opinion authored by Justice Huntley which holds that there is a justiciable controversy, mention is made that three members having determined there is here a justiciable controversy, how is it then that two members of this Court can abstain from a judicial determination of that inquiry? For instance, when three members of the Court decide to hear a petition for review of a judgment and opinion of the Court of Appeal, five of us participate in that review. In sum, I do not think that the parties and their extremely able counsel have received the attention of the Court commensurate with their considerable expenditure of effort on an issue of constitutional magnitude.

---

sions. But this does not leave us without a solution. A general prescription would call for states to pay legislators salaries which meet 'the cost of their election campaigns and [assure] them, during the period of their service, approximately the kind of living

which they are confident they could win in other pursuits.' Beyond a doubt, a substantial majority of states would fail this test." Keefe and Ogul, *The American Legislative Process*, p. 140.