# Constitutionality of Proposed Regulations
# of Joint Committee on Printing

Proposed regulations issued by the Joint Committee on Printing, which purport to regulate a broad array of printing activities of the Executive Branch, are not authorized by statute.

The proposed regulations are unconstitutional on two grounds. First, because members of the Joint Committee on Printing are not appointed in accordance with the Appointments Clause, art. II, § 2, cl.2 of the Constitution, they may not perform Executive functions, such as rulemaking, which may be performed only by properly appointed Officers of the United States. Second, the delegation of legislative power to the Joint Committee on Printing violates the constitutional requirements for legislative action, bicameral passage and presentment to the President.

April 11, 1984

MEMORANDUM OPINION FOR THE COUNSEL TO THE DIRECTOR,
OFFICE OF MANAGEMENT AND BUDGET

This responds to your request for our opinion on the constitutionality, in light of the Supreme Court's decisions in *Buckley* v. *Valeo,* 424 U.S. 1 (1976), and *INS* v. *Chadha,* 462 U.S. 919 (1983), of the proposed regulations published by the Joint Committee on Printing on November 11, 1983. For the reasons discussed below, we conclude that the regulations are statutorily unsupported and constitutionally impermissible.

The proposed regulations would effect a significant departure from the historical role of the Joint Committee on Printing (JCP).[1] Specifically, they would redefine "printing" to encompass virtually all processes by which legible material is created or stored, thus increasing the number of activities purportedly subject to JCP oversight and control. These activities include, among others, planning and design of government publications (defined to mean any textual material reproduced for distribution to government departments or to the public), word processing, data storage and document retrieval, apparently subsuming the operation of every copying facility of a department. The proposed regulations would require executive departments to submit annual plans outlining their intended activities and to seek advance approval of all projected goals, policies, strategies, purchases, publications, and means of distribution. In addition, departments would be asked to submit plans for a

---

[1] This is not to say that the current role of the JCP necessarily enjoys statutory authority or constitutional sanction. We have not attempted to evaluate those issues in this memorandum.

second and third year, seeking JCP approval of all projections relating to the expanded concept of printing. These obligations would "provide the committee with a broader and better overview of all of the Federal Government's printing and publishing activities." 129 Cong. Rec. 32286 (1983) (remarks of JCP Chairman Hawkins). The revised regulations, governing storage, duplication and distribution of information, "seek to replace JCP micro-management procedures with oversight and policymaking functions." *Id.*

The JCP is composed of the Chairman and two members of the Committee on Rules and Administration of the Senate and the Chairman and two members of the Committee on House Administration of the House of Representatives. 44 U.S.C. § 101. Vacancies are filled by the President of the Senate and the Speaker of the House of Representatives. *Id.* § 102. The authorized functions of the JCP are specified in various provisions of 44 U.S.C.

This memorandum will address, in turn, the three major legal issues suggested by these regulations: (1) whether there is statutory authority for the proposed regulations, (2) whether the regulations would involve congressional performance of executive functions, and (3) whether a joint committee of Congress is seeking to exercise legislative power. We conclude that the proposed regulations fail on all three grounds.[2]

## I. Statutory Authority

The first issue we address is the statutory basis for promulgation of these "legislative" rules. The Printing and Documents statute, 44 U.S.C., contains three sections upon which the JCP relies for its "regulatory" authority. The first is 44 U.S.C. § 103, which allows the JCP to "use any measures it considers necessary to remedy neglect, delay, duplication, or waste in the public printing and binding and the distribution of Government publications." Second, § 501 provides that all government printing, binding, and blank book work shall be done at the Government Printing Office (GPO), *except:* (1) work the JCP considers "to be urgent or necessary to have done elsewhere" and (2) printing in field plants operated by executive or independent departments, "if approved by the Joint Committee on Printing." Finally, § 502 provides that if the Public Printer is unable to do certain printing work at the GPO, he may enter into contracts to have the work produced elsewhere, "with the approval of the Joint Committee on Printing." As far as we are aware, these statutory provisions constitute the full extent to which the entire Congress might have been said to empower the JCP to participate in the decisionmaking process involving printing and distribution of materials published by the Executive Branch.

The proposed regulations were published in the Congressional Record on November 11, 1983, a gesture apparently not mandated by any existing statute.

---

[2] Because we conclude that the regulations as a whole cannot legally be enforced against the Executive Branch, we do not seek in this memorandum to discuss the legality of various provisions of the regulations individually. Consequently, we have not attempted to resolve the specific question raised in your request regarding the regulations' apparent effect of transferring to the GPO revenues that ordinarily would be paid into the accounts of individual agencies or the United States Treasury.

Nor are we aware of any other procedural requirements that might apply to promulgation of "regulations" such as these. Although Congress has enacted an elaborate scheme in the Administrative Procedure Act (APA) to control the issuance of regulations by executive agencies and to protect the persons subject to them by requiring broad opportunity for public notice and comment and availability of an administrative record reflecting these comments, we do not know of any analogous protections for those putatively subject to "legislative regulations." On the one hand, for the reasons stated in Part II of this memorandum, "legislative regulations" can apply only internally in Congress. Therefore one would not necessarily expect a scheme such as the APA to apply. On the other, it could also be assumed that had Congress contemplated or intended to authorize a committee's issuance of broad, binding regulations that could have an effect on the public and on the Executive Branch, it might have enacted a procedure comparable to the APA to ensure that the practice comports with the principles of due process. Thus, it could be argued that it is doubtful that Congress intended to authorize this committee to assume a regulatory role with respect to persons outside the Legislative Branch. *See INS v. Chadha*, 462 U.S. at 951.

At the very least, authority to regulate in a sweeping fashion cannot be presumed without an express indication that Congress has specifically delegated regulatory power.[3] The three statutory provisions mentioned above fall far short of a clear delegation of regulating authority.

## A. 44 U.S.C. § 103

The first, § 103 was originally enacted in 1852 in the following form:

> The Joint Committee on Printing shall have power to adopt such measures as may be deemed necessary to remedy any neglect or delay in the execution of the public printing, provided that no contract, agreement, or arrangement entered into by this committee shall take effect until the same shall have been approved by *that house of Congress to which the printing belongs, and when the printing delayed relates to the business of both houses, until both houses shall have approved of such contract or arrangement.*

Ch. 1, 10 Stat. 35 (1852) (emphasis added).

The language of that section, particularly the underlined portion, manifests its purpose: to allow the JCP to take remedial steps with regard to problems that may arise in having Congress' printing performed. The statute sought only to govern printing work for either or both Houses of Congress. The proviso, requiring one- or two-House approval for JCP remedial actions, was removed

---

[3] *Cf. Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S 607, 685–86 (1980) (Rehnquist, J., concurring) (delegation of regulatory authority to executive must provide "intelligible principle" to guide exercise of discretion).

in 1894 when Congress passed an amendment which left the JCP alone in charge of curing delay in congressional printing. The reason for the amendment was that "[i]t seemed to the committee [JCP] that this approval of their action in each instance by Congress would produce delay and defeat rather than advance efforts to prevent neglect or delay." 27 Cong. Rec. 30 (1894) (conference report). Congress gave no indication of any intention to change the scope of the JCP's remedial powers. Evidently, therefore, the committee's powers continued to extend only to the oversight of printing performed for either or both Houses of Congress.

By the time the JCP obtained this authority to remedy delay in the public printing without approval of either or both Houses, Congress had already passed a resolution requiring all public printing to be done at the newly formed government printing establishment (the precursor to § 501). Res. 25, 12 Stat. 118 (1860). Consequently, at the time Congress granted the JCP power over the "public printing," that term applied, without exception, to the operations of the GPO alone. Bearing in mind this relation between the precursors to §§ 103 and 501, we believe the authority given the JCP to remedy delay "in the execution of the public printing" was intended to extend only to the operations of the GPO, itself an organization within the Legislative Branch.[4] No subsequent legislative history of which we are aware has evinced a congressional intention to recast § 103 so that the JCP's remedial powers over the public printing would encompass operations outside the GPO.[5] That section does not supply a foundation for the JCP's attempt to reach beyond the GPO to all related activities irrespective of where they are conducted.

## B. 44 U.S.C. § 501

The second provision asserted as authority for the proposed regulations explicitly grants the JCP power to approve certain Executive Branch decisions regarding operation of field plant printing facilities. 44 U.S.C. § 501(2). Section 501 also allows the JCP to *approve* the outside printing of other classes of work when "necessary" or "urgent." *Id.* § 501(1). Neither the statute nor its history gives any suggestion, however, that the power to approve printing work was intended to be expanded into an all-encompassing authority to *regulate* all aspects of operations in the Executive Branch unrelated to the common understanding of "printing."

The legislative history of § 501 reflects an evolution, first, from a rule promulgated in 1860, requiring all printing to be done at the GPO, Res. 25, § 5, 12 Stat. 118 (1860), to an enactment of 1895, allowing exceptions to be

---

[4] *See Lewis* v. *Sawyer,* 698 F.2d 1261, 1263 (D.C. Cir. 1983) (Wald, J., concurring) (citing § 103 as example of congressional control over GPO in support of conclusion that GPO is a legislative unit).

[5] The section was amended in 1919, when the words "duplication" and "waste" and the phrase "and the distribution of Government publications" were added. Ch. 86, § 11, 40 Stat. 1270 (1919). No discussion or explanation of the change appears in the legislative history. *See* 57 Cong. Rec. 3865 (1919); H.R. Rep. No. 1146, 65th Cong., 3d Sess. 7 (1919).

45

"provided by law," ch. 23, § 87, 28 Stat. 662 (1895). That provision was altered in 1919, when Congress permitted certain classes of work to be done elsewhere than in the District of Columbia if the JCP deemed it necessary, ch. 86, § 11, 40 Stat. 1270 (1919), based on an explanation that such flexibility would save money for the government, 57 Cong. Rec. 3865 (amending H.R. 14078, 65th Cong., 3d Sess. (1919)). Finally, the two exceptions now codified in § 501 were enacted in 1949 to save further time and expense by permitting printing to be accomplished in the area where it is needed. Pub. L. No. 156, 63 Stat. 405 (1949). The explanations of the various amendments, although brief, indicate that the JCP's role was intended merely to ensure that the considerations of efficiency and economy were met in every case. H.R. Rep. No. 841, 81st Cong., 1st Sess. (1949), *reprinted in* 1949 U.S.C.C.A.N. 1515–16. Congress has never expressed, in connection with § 501, that it expected the JCP's approval power to be expanded into authority for overseeing, specifying, and regulating internal operations of the Executive Branch.

*C. 44 U.S.C. § 502*

Nor does § 502, which authorizes the Public Printer to obtain certain contract work, expressly or impliedly endow the JCP with the power to regulate the activities of the Executive Branch. By its terms that section allocates powers between the JCP and the GPO, a division of responsibilities among units largely within the Legislative Branch, and does not directly affect any activities of Executive departments.

Notwithstanding the absence of any express legislative authority for the JCP's assumption of the role of a regulatory commission over Executive Branch printing, word processing and information distribution systems, the JCP Chairman has characterized the Committee's efforts as a "regulatory scheme." 129 Cong. Rec. 32286 (1983). By redefining the statutory term "printing," the JCP has, in effect, attempted to control all functions related to the creation of a written word or symbol, including "all systems, processes and equipment used to plan . . . the form and style of an original reproducible image." *Id.* (Proposed Regulations, Title I, number 3). That attempt strays far from the JCP's statutory grant of authority under § 103, § 501, or § 502.

Because no legal foundation can be identified in support of either the "regulatory" expansion of the statutory term "printing" or the breadth of the entire proposed scheme over Executive Branch management decisions, established principles of administrative law compel the conclusion that the JCP has exceeded its statutory authority in issuing the proposed rules. *Cf.* 5 U.S.C. § 706(2)(c) (agency rulemaking); *City of Overton Park* v. *Volpe,* 401 U.S. 402, 415 (1971); *Schilling* v. *Rogers,* 363 U.S. 666, 676–77 (1960); L. Jaffe, *Judicial Control of Administrative Action* 359 (1965).

Although we believe that the proposed regulatory scheme lacks a valid statutory basis, we proceed to examine the implications of the regulations for the constitutional separation of powers.

## II. Legislative and Executive Functions

In view of the purported binding effect of the JCP's proposed regulations on Executive Branch agencies, the question arises whether the JCP, a Legislative Branch entity, is seeking to exercise executive functions in a manner that violates constitutional principles of the separation of powers. In *Buckley* v. *Valeo,* 424 U.S. 1 (1976), the Supreme Court, *per curiam,* struck down a provision of the Federal Election Campaign Act of 1971 which gave the Federal Election Commission, whose members were not all appointed by the President, the power to perform broad functions, including rulemaking, for enforcement of the Act. *Id.* at 141. The Court found that the Commission, so composed, was constitutionally precluded from performing executive tasks, because of the failure to comply with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The pivotal term "Officers of the United States" was explained by the Court to mean "any appointee[s] exercising significant authority pursuant to the laws of the United States," 424 U.S. at 126, and again as "all appointed officials exercising responsibility under the public laws of the Nation." *Id.* at 131. Officials meeting these qualifications must be appointed in the manner prescribed in Article II of the Constitution. *Id.* at 126. This is because the Legislature "cannot ingraft executive duties upon a legislative office," *Id.* at 136 (quoting *Springer* v. *Philippine Islands,* 277 U.S. 189, 202 (1928)); nor can it insulate persons performing executive tasks from the President's power to remove them. *Id.* In short, the Court held that Congress may not itself appoint persons to perform duties that may be performed only by an officer of the United States.

In analyzing the powers conferred on the Federal Election Commission, the Court in *Buckley* described three types of statutory functions: "functions relating to the flow of necessary information — receipt, dissemination, and investigation; functions relating to the Commission's task of fleshing out the statute — rulemaking and advisory opinions; and functions necessary to ensure compliance with the statute and rules — informal procedures, administrative determinations and hearings, and civil suits." 424 U.S. at 137. The Court held that "insofar as the powers confided in the Commission are essentially of an investigative and informative nature, falling in the same general category as those powers which Congress might delegate to one of its own committees,"

the Commission as then composed could constitutionally exercise them. However, "when we go beyond this type of authority to the more substantial powers exercised by the Commission, we reach a different result." *Id.* at 137–38. The Court held that each of the Commission's functions related to rulemaking and rendering advisory opinions "represents the performance of a significant governmental duty exercised pursuant to a public law," which could be performed only by persons appointed in accordance with the Appointments Clause. *Id.* at 141.

At the same time, the Supreme Court disavowed any intention to "deny to Congress 'all power to appoint its own inferior officers to carry out appropriate legislative functions.'" 424 U.S. at 128. Because, as discussed above, members of the JCP are not appointed in accord with Article II, we must address whether, by issuing and implementing the proposed regulations, the JCP would be performing functions of officers of the United States or merely carrying out appropriate legislative functions.

Applying the rule of *Buckley* v. *Valeo* to the rulemaking powers arrogated to itself by the JCP, we conclude that those powers are not "sufficiently removed from the administration and enforcement of public law to allow [them] to be performed by" persons not appointed in accordance with the Appointments Clause. 424 U.S at 141. We have described above the nature and extent of the JCP's proposed involvement in the printing operations of the Executive Branch, and the putatively binding nature of the JCP rules. Accordingly, like the rulemaking and advice-giving functions of the Federal Election Commission at issue in *Buckley,* the JCP's activities "represent the performance of a significant governmental duty exercised pursuant to a public law." *Id.*

Insofar as the JCP enjoys investigative and informative powers of the type generally delegated to congressional committees, the Constitution is no bar to its exercise of those powers. *Buckley* v. *Valeo,* 424 U.S. at 137; *McGrain* v. *Daugherty,* 273 U.S. 135, 175 (1927). One might assert that the JCP's powers over the GPO are just such internal powers which allow it to control all operations of the GPO and that Congress may constitutionally require all Executive Branch agencies to use the GPO facilities for all their printing needs.[6] Because certain standards and rules must necessarily be permissible in running the operations of the GPO, it might be suggested, the JCP inevitably exerts some powers over Executive agencies, which might then arguably be expanded to other arenas to the extent printing outside the GPO is permitted. However, the proposed regulations bear no relation to the smooth operation of the GPO; rather, they focus primarily on outside activities involving management of information. Thus, the GPO foundation upon which to build the expanded and comprehensive JCP regulatory structure is absent from the proposed regulatory scheme. We do not believe the constitutional demarcation of executive and legislative functions can be so easily eroded.

---

[6] The constitutionality of a statute requiring all agencies to use the GPO for their printing is not an issue necessary to evaluate the validity of the proposed regulations or the existing statutes. We therefore do not attempt to resolve this question.

The most egregious and illustrative provision in this regard is the require-ment that each Executive department submit annually to the JCP a plan outlin-ing its printing and distribution activities anticipated for the fiscal year and the following two years. Under the proposed regulations, the JCP would review each of these plans to determine its conformity with the objectives of the "Federal printing program," specifically evaluating the efficiency and cost effectiveness of the plan and the printing and distribution requirements of the Executive department. Only upon approval of the JCP could a department implement its plan. This "Federal printing program," a construct of the JCP, clearly involves the interpretation and implementation of policy directives that it is the job of the Legislature (acting as a legislature and not a committee) to identify and of the Executive to fulfill. Each step in this "micro-management" process constitutes a uniquely executive function, to execute faithfully the laws as constitutionally enacted by Congress.

In sum, administrative functions such as policymaking and rulemaking are quintessentially and traditionally executive duties; they are the duties of "Of-ficers of the United States." *See Springer* v. *Philippine Islands,* 277 U.S. 189, 202 (1928).[7] Yet the JCP unequivocally acknowledges its intention "to replace JCP micro-management procedures with oversight and policymaking func-tions," 129 Cong. Rec. 32285 (1983), and to establish a new "regulatory scheme," *id.* at 32285, all with respect to putative control of the Executive Branch. We cannot reconcile this endeavor with the Supreme Court's clear delineation of the functions assigned to the three Branches of the Government by the Constitution.[8]

This is not the first attempt at an express transformation of the JCP to a policymaking executive body. In 1919, Congress attempted explicitly to pro-vide, by statute, for a broad system of JCP regulatory authority not unlike the present scheme. Under the bill, passed by both Houses of Congress,

> no journal, magazine, periodical, or similar Government publi-
> cation shall be printed, issued, or discontinued by any branch or
> officer of the Government service unless the same shall have
> been authorized under such regulations as shall be prescribed by
> the Joint Committee on Printing . . . . [T]he foregoing provisions
> of this section shall also apply to mimeographing, multigraphing,

---

[7] *Cf. Lewis* v *Sawyer,* 698 F.2d 1261, 1263 (D.C. Cir. 1983) (Wald, J., concurring) (JCP's order that Public Printer halt furlough plans for GPO employees did not "encroach[] on another branch and thereby offend[] the constitutional separation of powers" only because GPO is a legislative, rather than an executive, unit). Each branch of the Federal Government can conduct the hiring and firing of employees within that branch, to carry out the respective mission of that branch, without treading upon the separation-of-powers doctrine. Of course, Congress can regulate hiring and firing of civil servants in the Executive Branch, but only by legislation, not by committee fiat.

[8] This conclusion would seem to apply equally to the "JCP micro-management procedures" currently in place as well as the establishment by the JCP of a new "regulatory scheme." It would seem irrefutable under *Buckley* and *Chadha* that micro-management of Executive Branch agencies is an inherently executive function, and one which must therefore be performed by officers of the United States duly appointed pursuant to Article II of the Constitution.

and other processes used for the duplication of typewritten and printed matter, other than official correspondence and office records.

H.R. 12610, 66th Cong., 2d Sess. (1919).

President Wilson vetoed the bill, voicing an adamant repudiation of any right Congress claimed to endow a committee "with power to prescribe 'regulations' under which executive departments may operate."[9] This historical perspective highlights an important aspect of the separation of powers issue. Following Congress' failure to accomplish its objective once through a constitutional process, the JCP may not now attempt to effect the same end by "regulation," circumventing the possible intervention of a Presidential veto. This usurpation of executive power is the very evil that the Supreme Court recognized when it quoted from *The Federalist* in its opinion in *INS* v. *Chadha:*

> If even no propensity had ever discovered itself in the legislative body to invade the rights of the Executive, the rules of just reasoning and theoretic propriety would of themselves teach us that the one ought not to be left to the mercy of the other, but ought to possess a constitutional and effectual power of self-defence.

462 U.S. at 947 (quoting The Federalist No. 73, at 458 (A. Hamilton) (H. Lodge ed. 1888)).

### III. Legislative Action

We next consider whether the JCP's proposed regulations can be treated as an exercise of Congress' constitutional power to legislate and, if so, whether the JCP could by itself exercise that legislative power. In 1690, John Locke wrote that "the Legislative can have no power to transfer their Authority of making Laws, and place it in other hands."[10] Nearly three hundred years later, the Supreme Court, in *INS* v. *Chadha,* restated the same principle as firmly embodied in the United States Constitution. The Court forcefully articulated the broad constitutional principle that all exercises of legislative power must undergo bicameral passage and presentment to the President unless the Constitution specifically authorizes a departure from the standard procedure. 462 U.S. at 946–51. Whether a particular action constitutes an exercise of legislative power requiring adherence to the rules of bicameral passage and presentment depends upon whether it is legislative in character. An action by Congress

---

[9] Veto Message on Legislative, Executive and Judicial Appropriation Bill, H.R. Doc. No. 764, 66th Cong., 2d Sess. 2–3 (1920). President Wilson's veto message was one basis upon which, in 1933, then Attorney General William D. Mitchell concluded that a statutory provision authorizing a joint committee of Congress to make final decisions regarding certain tax refunds was a trespass upon the constitutional separation of powers. He reasoned that the provision "attempts to entrust to members of the legislative branch, acting *ex officio,* executive functions in the execution of the law, and it attempts to give a committee of the legislative branch power to approve or disapprove executive acts." 37 Op. Att'y Gen. 56, 58 (1933).

[10] J. Locke, *Second Treatise of Government* § 141, at 381 (P. Laslett ed. 1980).

is "legislative" if it purports to have "the purpose and effect of altering the legal rights, duties and relations of persons, including . . . Executive Branch officials . . . , outside the legislative branch." *Id.* at 952.

Of the three statutory bases relied upon by the JCP for authority to issue its proposed regulations, only one explicitly allows the committee to approve or disapprove decisions of persons outside the Legislative Branch. 44 U.S.C. § 501(2). Section 501(2), which purports to allow the JCP unilaterally to create exceptions to the general rule that all printing must be accomplished through the GPO, would have the effect of empowering a committee of Congress to forestall, regulate, revise or manage executive printing operations which have been authorized through the legislative process in the form of authorization and appropriations acts for the agencies involved. This action inevitably affects the rights, duties, and relations of members of the other branches of government, and appears to meet the test for legislative action.[11]

The Supreme Court has also indicated that, in determining whether an act is legislative in character, it is useful to examine the nature of the congressional action which the committee's power supplants. *Chadha,* 462 U.S. at 962. Until the predecessor to § 501 was amended in 1919 to give some discretion to the JCP,[12] all printing had been centralized in the GPO, "except in cases otherwise provided by law."[13] This history suggests that the Committee's power to create exceptions to the statute originated as a substitute for plenary legislation — an action indubitably legislative in character.

We conclude that § 501 improperly seeks to delegate legislative power to the JCP in abrogation of the constitutional requirements of bicameral passage and presentment. Consequently, even the bare statutory approval power — unembellished by interpretative regulations — must fall as a compromise of the constitutional requirements for legislative action.[14]

Under the other two sources of putative authority propounded by the JCP, the proposed regulations fare no better. Although neither § 103 nor § 502 explicitly authorizes the JCP to affect the rights and relations of extra-legislative officials, the JCP proffers those sections as authority for placing constraints on the implementation of executive printing operations already sanc-

---

[11] Similarly, § 501(1) purportedly enables the JCP, by itself, to create exemptions from the legislated rule that all printing be done at the GPO. Although it does not operate expressly upon the statutory functions of the Executive Branch, it does purport to delegate a legislative function to a committee of Congress, which is also impermissible under *Chadha.* 462 U.S. at 952. Except insofar as the provision allows the JCP to control the internal printing affairs of Congress, *id.* at 955 n.21, it inevitably alters the rights, duties and relations of persons outside that branch by permitting a committee to effect an exception to a legislated rule, and therefore is an unconstitutional exercise of legislative power.

[12] Ch. 86, § 11, 40 Stat. 1270 (1919) (printing to be done by GPO "except such classes of work as shall be deemed by the Joint Committee on Printing to be urgent or necessary to have done elsewhere than in the District of Columbia for the exclusive use of any field service outside of said District").

[13] Ch. 23, § 87, 28 Stat. 662 (1895).

[14] This Office recently provided an opinion devoted exclusively to the constitutionality of the statutory approval power granted the JCP in 44 U.S.C. § 501(2). The opinion concluded that this power is invalid under *INS* v. *Chadha,* and that the ability of Executive departments to conduct authorized field-plant printing remains effective. Memorandum for William H. Taft, IV, Deputy Secretary of Defense, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel 15 (Mar. 2, 1984).

tioned with budget authority and appropriated funds. Insofar as the two sections can reasonably support the issuance of regulations restricting the lawful operations of all agencies and departments of the Federal Government, they too authorize a committee's exercise of legislative power and therefore cannot survive under *Chadha*. "A joint committee has not [sic] power to legislate, and legislative power cannot be delegated to it." 37 Op. Att'y Gen. 56, 58 (1933).

## IV. Conclusion

The defects in the committee approval and regulatory mechanism discussed here could well have been the object of the views articulated twenty-five years ago by then-Acting Attorney General William P. Rogers:

> Legislative proposals and enactments in recent years have reflected a growing trend whereby authority is sought to be vested in congressional committees to approve or disapprove actions of the executive branch. Of the several legislative devices employed, that which subjects executive department action to the prior approval or disapproval of congressional committees may well be the most inimical to responsible government. It not only permits organs of the legislative branch to take binding actions having the effect of law without the opportunity for the President to participate in the legislative process, but it also permits mere handfuls of members to speak for a Congress which is given no opportunity to participate as a whole. An arrangement of this kind tends to undermine the President's position as the responsible Chief Executive.

41 Op. Att'y Gen. 300, 301 (1957).

For the reasons expressed above, we have concluded that the regulations proposed by the Joint Committee on Printing are without foundation in law. First, no statute grants to the JCP, with adequate specificity, authority to issue regulations purporting to control operations within the Executive Branch for which budget authority and appropriated funds exist. Second, the JCP's attempted performance of executive functions in administering the laws transgresses the rule of separation of powers set forth in *Buckley* v. *Valeo*. Finally, a congressional committee's promulgation of rules binding on the other branches runs afoul of the constitutional requirement, affirmed in *INS* v. *Chadha*, that all legislative actions, with a few specifically stated exceptions not relevant here, undergo bicameral passage and presentment to the President.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

52