SPRINGER ET AL. *v.* GOVERNMENT OF THE PHILIPPINE ISLANDS.

AGONCILLO *v.* SAME.

Nos. 564 and 573. Argued April 10, 1928.—Decided May 14, 1928.

190

Mr. *John W. Davis*, with whom *Messrs. José A. Santos, James Ross, Quintin Paredes*, and *Claro M. Recto* were on the briefs, for petitioners.

The voting power of the government-owned stock in the National Coal Company is not an office, and all of respondent's contentions as to an alleged invasion of the Governor-General's asserted general power of appointing persons to public office, are, for that reason, quite beside the point. *Sheboygan County* v. *Parker*, 3 Wall. 92; *United States* v. *Hatch*, 1 Pin. (Wis.) 182; *United States* v. *Hartwell*, 6 Wall. 385; *United States* v. *Germaine*, 99 U. S. 508; *State* v. *Kennon*, 7 Oh. St. 546; *In the Matter of Oaths*, 20 Johnson, 492; *Bank of the United States* v. *Planters Bank*, 9 Wheat. 904. This latter case has been followed in *Bank of Kentucky* v. *Wister*, 3 Pet. 431; *Briscoe* v. *Bank of Kentucky*, 11 Pet. 323; *Darrington* v. *Bank of Alabama*, 13 How. 12; *Curran* v. *Arkansas*, 15 How. 304; *Sloan Shipyards Corp'n* v. *U. S. Shipping Board*, 258 U. S. 549, and in other cases. *C. & D. Canal Co.* v. *United States*, 250 U. S. 123; *Shoemaker* v. *United States*, 147 U. S. 282.

The Philippine Legislature has all general legislative powers such as are exercised by States and Territories.

The voting of the government-owned stock is merely a part of the machinery for the management of the corporation, and, under the Legislature's power to create corporations for the attainment of objects within its powers and to provide for the organization of such corporations and for their management, the Legislature may confer the voting power of the corporate stock as it sees fit.

Congress has often created corporations to act for it in the attainment of those objects that are within its powers and has often given over the voting power in such corporations to persons other than executive officers of the Government, or—what is the same thing where the corporations have been without capital stock—it has given over the management of the corporations to such persons. Examples of the latter sort are the Smithsonian Institution and the National Home for Disabled Soldiers.

A more frequently used extra-governmental means for the attainment of Congressional objectives has been the privately owned stock company, such, for example, as those concerned in *California* v. *Pacific R. R. Co.*, 127 U. S. 1, and *Luxton* v. *North River Bridge Co.*, 153 U. S. 525.

Plainly, corporations such as those involved in the two foregoing cases exercise the functions that some executive departments would exercise if Congress chose to " use its sovereign powers directly." Yet, despite this fact and despite the fact that such corporations are instruments through which Congress exercises portions of its sovereign power, it has nevertheless been usual to confide to the private stockowners in such corporations the power of control through the stock-voting power.

Government ownership, this Court has repeatedly held, is insufficient to blur the corporate lines that separate such corporations as that herein concerned from the government that has created them. *Bank of the United States*

v. *Planters Bank,* 9 Wheat. 904; *Bank of Kentucky* v. *Wister,* 3 Pet. 431; *Briscoe* v. *Bank of Kentucky,* 11 Pet. 324; *Darrington* v. *Bank of Alabama,* 13 How. 12; *Curran* v. *Arkansas,* 15 How. 304; *Sloan Shipyards Corp'n* v. *U. S. Shipping Board,* 258 U. S. 549; *United States* v. *Strang,* 254 U. S. 491; *Skinner & Eddy* v. *McCarl,* 275 U. S. 1.

Where the extra-governmental entity is chosen, the cases indicate that insofar as the management of its corporate affairs is concerned, the corporation so created is in the fullest degree a separate entity. The only blurring of the corporate lines has been in the extension of governmental privileges and protection to such corporations. *Russel Motor Car Co.* v. *United States,* 261 U. S. 514; *United States* v. *Walter,* 263 U. S. 15; *Clallam County* v. *United States,* 263 U. S. 341; *U. S. Grain Corp'n* v. *Phillips,* 261 U. S. 106; *Emergency Fleet Corp'n* v. *Western Union,* 275 U. S. 415.

Conceding, *arguendo,* that the corporate entity of the National Coal Company may be disregarded and that the power of voting the government-owned stock may be regarded as a duty of caring for government property, that voting power, as such a duty, is nevertheless properly confided to legislative officers.

It is well settled that under § 3 of Art. IV of the Constitution, neither the President nor the heads of any of the executive departments have any powers in respect to the use or disposal of public property apart from those given them by Congress. *Pan American Petroleum Co.* v. *United States,* 273 U. S. 456; *Mammoth Oil Co.* v. *United States,* 274 U. S. 13; *United States* v. *Hare,* Fed. Cas. No. 15,303; *Knote* v. *United States,* 10 Ct. Cls. 397; *Flores* v. *United States,* 18 Ct. Cls. 352; *Lear* v. *United States,* 50 Fed. 65; *United States* v. *Nichol,* Fed. Cas. No. 15,879.

The authority of Congress may be given either generally in reference to a class of properties or specifically in reference to a particular property, and Congress can with-

draw a pending contest over the right of entry of public lands from the jurisdiction of the land department and itself determine the rights of the parties involved. *Emblen* v. *Lincoln Land Co.,* 102 Fed. 559, affirmed, 184 U. S. 660.

The powers of Congress in the care of government property are plenary. In that behalf the executive departments are no more than the agents or instrumentalities of Congress. It is plain that the duty of caring for government property, far from being " surely executive," is, in fact, legislative in character. The executive departments ordinarily perform the detail of such care; but to Congress belongs the power of direction and such direction may be as specific as Congress sees fit to make it.

While the constitutional provision is not of course directly applicable to the Philippine Legislature, it and the decisions under it are important as showing the scope of legislative power in respect of the care, management, use and disposal of government property under the American theory of government.

Officers of the National Coal Company are not officers of the Philippine Government, and the fact that the voting power of the government-owned stock is to be exercised for the purpose, *inter alia,* of selecting such officers, does not make that voting power a part of the Governor-General's asserted power of appointing persons to public office.

If voting the government-owned stock were an office, the President of the Senate and Speaker of the House of Representatives would be eligible to hold it.

The Governor-General of the Philippine Islands has no general power of appointing persons to public office and the alleged " offices " herein involved would not be within the powers of appointment specifically given to him under the Autonomy Act, even if they were prop-

erly regarded as "offices" within the meaning of that Act.

The Philippine statutes here in question have received the implied sanction of Congress and should not be disturbed. *Clinton* v. *Englebrecht,* 13 Wall. 434; *Gromer* v. *Std. Dredging Co.,* 224 U. S. 362; *Tiaco* v. *Forbes,* 228 U. S. 549; *Chanco* v. *Imperial,* 34 Phil. Rep. 329; *United States* v. *Bull,* 15 Phil. Rep. 31; *Baca* v. *Perez,* 8 N. M. 187; *Gallardo* v. *Porto Rico Rwy. Co.,* 18 F. (2d) 918; *Fajardo Sugar Co.* v. *Holcomb,* 16 F. (2d) 92; *Myers* v. *United States,* 272 U. S. 52; *Binns* v. *United States,* 194 U. S. 486.

*Solicitor General Mitchell,* with whom *Messrs. Frederick C. Fisher, Wm. Cattron Rigby, Hugh C. Smith, Robert P. Reeder,* Special Assistant to the Attorney General, *John A. Hull,* Judge Advocate General, U. S. A., and *Delfin Jaranilla,* Attorney General of the Philippine Islands, were on the brief, for respondent.

The Acts of the Philippine Legislature, read in connection with other statutes relating to the Philippine National Bank, the National Coal Company, and corporations in general, have the effect of stripping the Governor General of all direction or control over the Bank or Coal Company and of vesting the direction of the management and operation of those institutions in representatives of the two Houses of the Legislature selected by those Houses. The President of the Senate and the Speaker of the House of Representatives are selected by those bodies and hold office during their pleasure. They, in turn, acting together on the so-called Board of Control, elect and remove the managing directors and agents of these corporations, and in the case of the Bank, they also directly participate with those officers and agents in conducting the bank's affairs. The effect of these provisions

is that the majority in the Legislature, acting through representatives doing their bidding, from day to day direct and control the operations and management of these institutions.

The selection and removal of the managing directors and officers of corporations, a majority of the stock of which is owned by the Government, and the direction of the operations of those corporations through the exercise of that power, are not legislative functions. They do not constitute the making or repealing of laws or anything incidental to such legislative action. The voting of the Government's stock is itself not legislative, and the depriving the Governor General of all control of the operations of these corporations is in direct violation of that provision of the Organic Act contained in § 22, which provides that all executive functions must be under the Governor General or within one of the executive departments under his supervision and control. It is not material whether the relation of the Philippine Government to these corporations is proprietary or sovereign, or whether the corporations are engaged in performing sovereign governmental functions or conducting private business. The power of the Philippine Legislature over matters in which the Philippine Government acts in a proprietary capacity, is legislative. It has no more power to exercise administrative or executive functions over proprietary interests of the Government than it has over sovereign governmental functions, and the exclusion of the Legislature from participation in administrative or executive functions, and the granting of those functions to the Governor General and his subordinates, operate on all governmental matters whether proprietary or sovereign.

If membership on the " Board of Control " or " Committee " is a separate post or position from that of Governor General or of President of the Senate or of Speaker

of the House of Representatives, then the selection by the Legislature or by either House of the persons to occupy that position is beyond legislative power, because in itself an executive act. If the functions to be exercised by members of the Board of Control or Committee are executive or administrative in character, the selection of those members is not a legislative act.

The ultimate question here is again whether voting the stock and directing the affairs of these corporations are executive functions, and it is not important whether the position on the Board of Control or Committee is a separate office or post, or whether the Legislature has merely added certain duties to those of the President of the Senate and the Speaker of the House of Representatives. It may not make appointments to executive or administrative positions, and it may not confer executive or administrative functions on legislative officials.

That Congress has not taken any action to affirmatively annul these statutes is of no consequence. The power reserved in the Organic Act to annul Acts of the Philippine Legislature, relates to valid Acts passed under authority of the Organic Act and consistent with it. It was never contemplated that Acts of the Philippine Legislature, void because in conflict with the Organic Act, would become valid unless their invalidity be reiterated by Congress within a reasonable time.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

These cases, presenting substantially the same question, were argued and will be considered and disposed of together. In each case an action in the nature of *quo warranto* was brought in the court below challenging the right to hold office of directors of certain corporations organized under the legislative authority of the Philippine

Islands, No. 564 involving directors of the National Coal Company and No. 573 involving directors of the Philippine National Bank.

The National Coal Company was created by Act 2705, approved March 10, 1917, subsequently amended by Act 2822, approved March 5, 1919. The Governor-General, under the provisions of the amended act, subscribed on behalf of the Philippine Islands for substantially all of the capital stock. The act provides: " The voting power of all such stock owned by the Government of the Philippine Islands shall be vested exclusively in a committee, consisting of the Governor-General, the President of the Senate and the Speaker of the House of Representatives."

The National Bank was created by Act 2612, approved February 4, 1916, subsequently amended by Act 2747, approved February 20, 1918, and Act 2938, approved January 30, 1921. The authorized capital of the bank, as finally fixed, was 10,000,000 pesos, consisting of 100,000 shares, of which, in pursuance of the legislative provisions, the Philippine Government acquired and owns 97,332 shares, the remainder being held by private persons. By the original act the voting power of the government-owned stock was vested exclusively in the Governor-General, but by the amended acts now in force that power was " vested exclusively in a board, the short title of which shall be ' Board of Control,' composed of the Governor-General, the President of the Senate, and the Speaker of the House of Representatives." The Governor-General was also divested of the power of appointment of the President and Vice-President of the bank, originally vested in him, and their election was authorized to be made by the directors from among their own number. Provision was also made for a general manager, to be appointed or removed by the board of directors with the advice and consent of the Board of Control. The manager was to be chief executive of the bank, with an annual

salary to be fixed by the board of directors with the approval of the Board of Control. Further duties were conferred upon the Board of Control in connection with the management of the bank which it does not seem necessary to set forth.

It is worthy of note that this voting power has been similarly devolved by the legislature in the case of at least four other corporations: The National Petroleum Company, by Act 2814; The National Development Company, by Act 2849; The National Cement Company, by Act 2855; and The National Iron Company, by Act 2862; and the suggestion of the Solicitor General that this indicates a systematic plan on the part of the legislature to take over, through its presiding officers, the direct control generally of nationally organized or controlled stock corporations would seem to be warranted.

In pursuance of the first quoted provision, petitioners in No. 564 were elected directors of the National Coal Company by a vote of the government-owned shares cast by the President of the Senate and the Speaker of the House; and in pursuance of the second quoted provision, petitioners in No. 573 were elected directors of the National Bank in the same way. The Governor-General, challenging the validity of the legislation, did not participate in either election. While there are some differences between the two actions in respect of the facts, they are differences of detail which do not affect the substantial question to be determined.

On behalf of the Philippine Government, respondent in both cases, it is contended that the election of directors and managing agents by a vote of the government-owned stock was an executive function entrusted by the Organic Act of the Philippine Islands to the Governor-General, and that the acts of the Legislature divesting him of that power and vesting it, in the one case, in a " board," and, in the other, in a " committee," the majority of which in

each instance consisted of officers and members of the Legislature, were invalid as being in conflict with the Organic Act. The court below sustained the contention of the Government and entered judgments of ouster against the petitioners in each case.

The Congressional legislation referred to as the "Organic Act" is the enactment of August 29, 1916, c. 416, 39 Stat. 545, which constitutes the fundamental law of the Philippine Islands and bears a relation to their governmental affairs not unlike that borne by a state constitution to the state. The act contains a bill of rights, many of the provisions of which are taken from the federal Constitution. It lays down fundamental rules in respect of taxation, shipping, customs duties, etc. Section 8 of the act provides, "That general legislative power, except as otherwise herein provided, is hereby granted to the Philippine Legislature, authorized by this Act." And by § 12 this legislative power is vested in a legislature, to consist of two houses, one the senate and the other the house of representatives. Provision is made (§§ 13, 14 and 17) for memberships, terms and qualifications of the members of each house. By § 21 it is provided "that the supreme executive power shall be vested in an executive officer, whose official title shall be 'The Governor General of the Philippine Islands.'" He is given "general supervision and control of all of the departments and bureaus of the government in the Philippine Islands as far as is not inconsistent with the provisions of this Act." He is made "responsible for the faithful execution of the laws of the Philippine Islands and of the United States operative within the Philippine Islands." Other powers of an important and comprehensive character also are conferred upon him. By § 22 the executive departments of the Philippine government, as then authorized by law, are continued until otherwise provided by the legislature The legislature is authorized by appropriate legislation to

"increase the number or abolish any of the executive departments, or make such changes in the names and duties thereof as it may see fit," and "provide for the appointment and removal of the heads of'the executive departments by the Governor General." Then follows the proviso: " That all executive functions of the government must be directly under the Governor General or within one of the executive departments under the supervision and control of the Governor General." Section 26 recognizes the existing supreme court and courts of first instance of the Islands and continues their jurisdiction as theretofore provided, with such additional jurisdiction as shall thereafter be prescribed by law.

Thus the Organic Act, following the rule established by the American constitutions, both state and federal, divides the government into three separate departments—the legislative, executive and judicial. Some of our state constitutions expressly provide in one form or another that the legislative, executive and judicial powers of the government shall be forever separate and distinct from each other. Other constitutions, including that of the United States, do not contain such an express provision. But it is implicit in all, as a conclusion logically following from the separation of the several departments. See *Kilbourn* v. *Thompson,* 103 U. S. 168, 190–191. And this separation and the consequent exclusive character of the powers conferred upon each of the three departments is basic and vital—not merely a matter of governmental mechanism. That the principle is implicit in the Philippine Organic Act does not admit of doubt. See *Abueva* v. *Wood,* 45 Phil. Rep. 612, 622, 628 *et seq.*

It may be stated then, as a general rule inherent in the American constitutional system, that, unless otherwise expressly provided or incidental to the powers conferred, the legislature cannot exercise either executive or judicial power; the executive cannot exercise either legislative or

judicial power; the judiciary cannot exercise either executive or legislative power. The existence in the various constitutions of occasional provisions expressly giving to one of the departments powers which by their nature otherwise would fall within the general scope of the authority of another department emphasizes, rather than casts doubt upon, the generally inviolate character of this basic rule.

Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions. It is unnecessary to enlarge further upon the general subject, since it has so recently received the full consideration of this Court. *Myers* v. *United States*, 272 U. S. 52.

Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the case might be different if the additional duties were devolved upon an appointee of the executive. *Shoemaker* v. *United States,* 147 U. S. 282, 300–301. Here the members of the legislature who constitute a majority of the " board " and " committee," respectively, are not charged with the performance of any legislative functions or with the doing of anything which is in aid of the performance of any such functions by the legislature. Putting aside for the moment the question whether the duties devolved upon these members are vested by the Organic Act in the Governor-General, it is clear that they are not legislative in character, and still more clear that they are not judicial. The fact that they do not fall within the authority of either of these two constitutes logical ground for concluding that they do fall within that of the remaining one of the three among

which the powers of government are divided. Compare *Myers* v. *United States, supra,* pp. 117–118.

Assuming, for present purposes, that the duty of managing this property, namely, the government-owned shares of stock in these corporations, is not sovereign but proprietary in its nature, the conclusion must be the same. The property is owned by the government, and the government in dealing with it whether in its quasi-sovereign or. its proprietary capacity nevertheless acts in its governmental capacity. There is nothing in the Organic Act, or in the nature of the legislative power conferred by it, to suggest that the legislature in acting in respect of the proprietary rights of the government may disregard the limitation that it must exercise legislative and not executive functions. It must deal with the property of the government by making rules, and not by executing them. The appointment of managers (in this instance corporate directors) of property or a business is essentially an executive act which the legislature is without capacity to perform directly or through any of its members.

Whether the members of the "board" or the "committee" are public officers in a strict sense we do not find it necessary to determine. They are public agents at least, charged with the exercise of executive functions and, therefore, beyond the appointing power of the legislature. *Stockman* v. *Leddy,* 55 Colo. 24, involved a case very much like that now under consideration. The state legislature had created a committee of its own members to investigate the rights of the state in the flowing waters therein. The committee was authorized to determine what steps were necessary to be taken to protect the rights of the state, to employ counsel, etc. There was no claim that the investigation was for the purpose of ascertaining facts to aid in future legislation or to assist the legislature in its legislative capacity, but it was for the pur-

pose of enabling the committee itself to reach a conclusion as to what should be proper to do in order to protect the rights of the state. The court, in holding the act unconstitutional, said (p. 31): " In other words, the general assembly not only passed an act—that is, made a law—but it made a joint committee of the senate and the house as its executive agent to carry out that law. This is a clear and conspicuous instance of an attempt by the general assembly to confer executive power upon a collection of its own members." And the court held that this was invalid under the provisions of the state constitution respecting the tripartite division of governmental powers. See also, *Clark* v. *Stanly*, 66 N. C. 59; *State ex rel. Howerton* v. *Tate*, 68 N. C. 546.

Petitioners seek to draw a parallel between the power of Congress to create corporations as appropriate means of executing governmental powers and the acts of the Philippine legislature here under consideration. To what extent the powers of the two bodies in this respect may be assimilated we need not stop now to determine, since the power of the legislature to create the two corporations here involved is not doubted. But it is argued further that Congress in creating corporations for governmental purposes has sometimes devolved the voting power in such corporations upon persons other than executive officers. In the case of the Smithsonian Institution, cited as an example, Congress provided for a governing Board of Regents composed in part of members of the Senate and of the House. There are two or three other instances in respect of non-stock organizations of like character. On the other hand, as pointed out by the Solicitor General, in the case of governmentally organized or controlled stock corporations, Congress has uniformly recognized the executive authority in their management, generally providing in express terms that the shares shall be voted

by an executive officer, and in no instance attempting to grant such power to one or more of its members. Many instances of this kind are cited by the Solicitor General, but it is not necessary to repeat his enumeration. It is enough to say that, when we consider the limited number of acts of Congress which fall within the first class spoken of above, as well as the peculiar character of the institutions dealt with, and the contrary attitude of Congress toward corporations of a different character, such acts cannot be regarded as lending support to a construction of the Constitution which would justify Congressional legislation like that here involved. As this Court said in *Myers v. United States, supra,* pp. 170–171.

" In the use of Congressional legislation to support or change a particular construction of the Constitution by acquiescence, its weight for the purpose must depend not only upon the nature of the question, but also upon the attitude of the executive and judicial branches of the Government, as well as upon the number of instances in the execution of the law in which opportunity for objection in the courts or elsewhere is afforded. When instances which actually involve the question are rare, or have not in fact occurred, the weight of the mere presence of acts on the statute book for a considerable time, as showing general acquiescence in the legislative assertion of a questioned power, is minimized."

And we are further of the opinion that the powers asserted by the Philippine Legislature are vested by the Organic Act in the Governor-General. The intent of Congress to that effect is disclosed by the provisions of that act already set forth. Stated concisely these provisions are: that the supreme executive power is vested in the Governor-General, who is given general supervision and control over all the departments and bureaus of the Philippine government; upon him is placed the responsi-

bility for the faithful execution of the laws of the Philippine Islands; and, by the general proviso, already quoted, all executive functions must be directly under the Governor-General or within one of the executive departments under his supervision and control. These are grants comprehensive enough to include the powers attempted to be exercised by the legislature by the provisions of law now under review. *Myers* v. *United States, supra.*

It is true that § 21 contains a specific provision that the Governor-General shall appoint such officers as may now be appointed by the Governor-General, or such as he is authorized by this act to appoint, or whom he may hereafter be authorized by law to appoint. And it is said that the effect of this is to confine the Governor-General's powers of appointment within the limits of this enumeration. The general rule that the expression of one thing is the exclusion of others is subject to exceptions. Like other canons of statutory construction it is only an aid in the ascertainment of the meaning of the law and must yield whenever a contrary intention on the part of the law-maker is apparent. Where a statute contains a grant of power enumerating certain things which may be done and also a general grant of power which standing alone would include these things and more, the general grant may be given full effect if the context shows that the enumeration was not intended to be exclusive. See for example, *Ford* v. *United States,* 273 U. S. 593, 611; *Portland* v. *N. E. T. & Co.,* 103 Me. 240, 249; *Grubbe* v. *Grubbe,* 26 Or. 363, 370; *Swick* v. *Coleman,* 218 Ill. 33, 40; *Lexington ex rel.* v. *Commercial Bank,* 130 Mo. App. 687, 692; *McFarland* v. *M. K. & T. Ry. Co.,* 94 Mo. App. 336, 342.

Applying these principles, we are unable to accept the contention that the enumeration here in question is exclusive in the face of the general provisions already quoted and particularly of that one which declares that

all executive functions are vested directly in the Governor-General or under his supervision and control. It is true that this provision is in the form of a proviso, and it is argued that it is, therefore, nothing more than a definition by negation of the power given to the legislature in the same section. But an analysis of the section, which is reproduced so far as pertinent in the margin,* shows, though not wholly beyond doubt, that the power given to the legislature is itself a proviso. In other words, both the grant of power to the legislature and the grant of power to the Governor-General are in form provisos to the general provisions of § 22 which precede them. It is difficult to assign to either proviso the general purpose of that form of legislation, which is merely to qualify the operation of the general language which preceeds it. We think rather that both provisos are to be construed as independent and substantive provisions. As this Court has more than once pointed out, it is not an uncommon practice in legislative proceedings to include independent pieces of legislation under the

---

* Sect 22. That, except as provided otherwise in this Act, the executive departments of the Philippine government shall continue as now authorized by law until otherwise provided by the Philippine Legislature. When the Philippine Legislature herein provided shall convene and organize, the Philippine Commission, as such, shall cease and determine, and the members thereof shall vacate their offices as members of said commission: *Provided*, That the heads of executive departments shall continue to exercise their executive functions until the heads of departments provided by the Philippine Legislature pursuant to the provisions of this Act are appointed and qualified. The Philippine Legislature may thereafter by appropriate legislation increase the number or abolish any of the executive departments, or make such changes in the names and duties thereof as it may see fit, and shall provide for the appointment and removal of the heads of the executive departments by the Governor-General: *Provided*, That all executive functions of the government must be directly under the Governor General or within one of the executive departments under the supervision and control of the Governor General. . . .

head of provisos. See *Georgia Banking Co.* v. *Smith,* 128 U. S. 174, 181; *White* v. *United States,* 191 U. S. 545, 551; *Cox* v. *Hart,* 260 U. S. 427, 435.

Finally, it is urged that since no action has been taken by Congress under § 19 of the Organic Act, requiring all laws enacted by the Philippine Legislature to be reported to Congress, which reserves the power to annul them, the legislation now under review has received the implied sanction of Congress and should not be disturbed. *Clinton* v. *Englebrecht,* 13 Wall. 434, 446, is cited in support of this contention. In that case jurors were summoned into the legislative courts of the territory of Utah under the provisions of acts of Congress applicable only to the courts of the United States. This Court held that the jurors were wrongly summoned and a challenge to the array should have been sustained. The Court, however, proceeded also to examine the jury law enacted by the territorial legislature, and declared it to be valid. In the course of the opinion it was said that since the simple disapproval by Congress at any time would have anulled that law, it was not unreasonable to infer that it was approved by that body. In the later case of *Clayton* v. *Utah Territory,* 132 U. S. 632, an act of the same territory providing for the appointment of certain officers, was held to be void as in contravention of a provision of the territorial Organic Act vesting in the Governor the power to appoint such officers. Dealing with the same point here made, this Court said (p. 642):

" It is true that in a case of doubtful construction the long acquiescence of Congress and the general government may be resorted to as some evidence of the proper construction, or of the validity, of a law. This principle is more applicable to questions relating to the construction of a statute than to matters which go to the power of the legislature to enact it. At all events, it can hardly be admitted as a general proposition that under the power of

Congress reserved in the organic acts of the Territories to annul the acts of their legislatures the absence of any action by Congress is to be construed to be a recognition of the power of the legislature to pass laws in conflict with the act of Congress under which they were created."

The inference of an approval by Congress from its mere failure to act at best rests upon a weak foundation. And we think where the inference is sought to be applied, as here, to a case where the legislation is clearly void as in contravention of the Organic Act it cannot reasonably be indulged. To justify the conclusion that Congress has consented to the violation of one of its own acts of such fundamental character, will require something more than such inaction upon its part as really amounts to nothing more than a failure affirmatively to declare such violation by a formal act.

Whether the Philippine Legislature, in view of the alternative form of the provision vesting all executive functions directly under the Governor-General or within one of the executive departments under his supervision and control, might devolve the voting power upon the head of an executive department or an appointee of such head, we do not now decide. The legislature has not undertaken to do so; and in the absence of such an attempt it necessarily results that the power must be exercised directly by the Governor-General or by his appointee, since he is the only executive now definitely authorized by law to act.

The judgments in both cases are

*Affirmed.*

MR. JUSTICE HOLMES.

The great ordinances of the Constitution do not establish and divide fields of black and white. Even the more specific of them are found to terminate in a penumbra shading gradually from one extreme to the other. Property must not be taken without compensation, but with

the help of a phrase, (the police power) some property may be taken or destroyed for public use without paying for it, if you do not take too much. When we come to the fundamental distinctions it is still more obvious that they must be received with a certain latitude or our government could not go on.

To make a rule of conduct applicable to an individual who but for such action would be free from it is to legislate—yet it is what the judges do whenever they determine which of two competing principles of policy shall prevail. At an early date it was held that Congress could delegate to the Courts the power to regulate process, which certainly is lawmaking so far as it goes. *Wayman* v. *Southard,* 10 Wheat. 1, 42. *Bank of the United States* v. *Halstead,* 10 Wheat. 51. With regard to the Executive, Congress has delegated to it or to some branch of it the power to impose penalties, *Oceanic Steam Navigation Co.* v. *Stranahan,* 214 U. S. 320; to make conclusive determination of dutiable values, *Passavant* v. *United States,* 148 U. S. 214; to establish standards for imports, *Buttfield* v. *Stranahan,* 192 U. S. 470; to make regulations as to forest reserves, *United States* v. *Grimaud,* 220 U. S. 506, and other powers not needing to be stated in further detail. *Houston* v. *St. Louis Independent Packing Co.,* 249 U. S. 479. *Union Bridge Co.* v. *United States,* 204 U. S. 364. *Ex parte Kollock,* 165 U. S. 526. Congress has authorized the President to suspend the operation of a statute, even one suspending commercial intercourse with another country, *Field* v. *Clark,* 143 U. S. 649, and very recently it has been decided that the President might be given power to change the tariff. *J. W. Hampton, Jr., & Co.* v. *United States,* 276 U. S. 394. It is said that the powers of Congress cannot be delegated, yet Congress has established the Interstate Commerce Commission, which does legislative, judicial and executive acts, only softened by a *quasi;* makes regulations, *Intermountain Rate Cases,*

234 U. S. 476, 486, issues reparation orders, and performs executive functions in connection with Safety Appliance Acts, Boiler Inspection Acts, &c. Congress also has made effective excursions in the other direction. It has withdrawn jurisdiction of a case after it has been argued. *Ex parte McCardle*, 7 Wall. 506. It has granted an amnesty, notwithstanding the grant to the President of the power to pardon. *Brown* v. *Walker*, 161 U. S. 591, 601. A territorial legislature has granted a divorce. *Maynard* v. *Hill*, 125 U. S. 190. Congress has declared lawful an obstruction to navigation that this Court has declared unlawful. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421. Parallel to the case before us, Congress long ago established the Smithsonian Institution, to question which would be to lay hands on the Ark of the Covenant; not to speak of later similar exercises of power hitherto unquestioned, so far as I know.

It does not seem to need argument to show that however we may disguise it by veiling words we do not and cannot carry out the distinction between legislative and executive action with mathematical precision and divide the branches into watertight compartments, were it ever so desirable to do so, which I am far from believing that it is, or that the Constitution requires.

The only qualification of such latitude as otherwise would be consistent with the threefold division of power, is the proviso in § 22 of the organic Act " that all executive functions of the Government must be directly under the Governor General or within one of the executive departments," &c. Act of August 29, 1916, c. 416, 39 Stat. 553, U. S. C., Title 48, § 1114. That does not appear to me to govern the case. The corporations concerned were private corporations which the legislature had power to incorporate. Whoever owned the stock, the corporation did not perform functions of the Government. This

would be plain if the stock were in private hands, and if the Government bought the stock from private owners the functions of the corporations would not be changed. If I am right in what I have said I think that ownership would not make voting upon the stock an executive function of the Government when the acts of the corporation were not. I cannot believe that the legislature might not have provided for the holding of the stock by a board of private persons with no duty to the Government other than to keep it informed and to pay over such dividends as might accrue. It is said that the functions of the Board of Control are not legislative or judicial and therefore they must be executive. I should say rather that they plainly are no part of the executive functions of the Government but rather fall into the indiscriminate residue of matters within legislative control. I think it would be lamentable even to hint a doubt as to the legitimacy of the action of Congress in establishing the Smithsonian as it did, and I see no sufficient reason for denying the Philippine legislature a similar power.

MR. JUSTICE BRANDEIS agrees with this opinion.

MR. JUSTICE McREYNOLDS.

I think the opinion of the majority goes much beyond the necessities of the case.

The " Organic Act " is careful to provide: " That all executive functions of the government must be directly under the Governor General or within one of the executive departments under the supervision and control of the Governor General."

A good reason lies behind this limitation which does not apply to our Federal or State governments. From the language employed, read in the light of all the circumstances, perhaps it is possible to spell out enough to overthrow the challenged legislation. Beyond that it is unnecessary to go.