804 P.2d 308

Bruce L. SWEENEY, Ron J. Beitelspacher, Charles E. Bilyeu, Michael Blackbird, Karl Brooks, Michael Burkett, Marti Calabretta, Dennis Davis, Brian Donesley, Terry Haun, Sally Snodgrass, Patricia McDermott, Mary Lloyd, Cynthia Scanlin, Marguerite McLaughlin, John Peavey, Mary Lou Reed, Sue Reents, Tim Tucker, Claire Wetherell, and Betty Benson, Senators of the 51st Idaho Legislature, First Session, and Members of the Democratic Party, Petitioners,

v.

C.L. OTTER, Lieutenant Governor of the State of Idaho; Michael Crapo, Russell Newcomb, Herb Carlson, Allen Larsen, Denton Darrington, Rex Furness, Edward Osborne, Dennis Hansen, John Hansen, Mary Hartung, Joyce McRo-

berts, Laird Noh, Atwell Parry, Mark Ricks, Stan Hawkins, David Kerrick, Lee Staker, J.L. Thorne, Lynn Tominaga, Jerry Twiggs, and George Vance, Senators of the 51st Idaho Legislature, First Session, and Members of the Republican Party, Respondents.

No. 19035.

Supreme Court of Idaho,
Boise, December 1990 Term.

Dec. 24, 1990.

Elam, Burke & Boyd; Carl Burke (argued), Bobbi K. Dominick, Brigette Bilyeu, and Bradlee R. Frazer, Boise, for petitioners.

Hopkins, French, Crockett, Springer & Hoopes, C. Timothy Hopkins (argued), Lary S. Larson, and Steven K. Brown, Idaho Falls, for respondents.

McDEVITT, Justice.

In the 1990 Idaho general election, 21 members of the Republican party and 21 members of the Democratic party were elected as the 42 members of the Idaho State Senate in the 51st Idaho Legislature. For the first time in the history of this state, the members of the Senate were equally divided between two political parties.

Following the swearing-in of the Senators-elect on December 6, 1990, one of the first actions taken by the Senate was the selection of the President Pro Tempore. First, the Democrats placed in nomination for this position the name of Senator Bruce L. Sweeney. The vote of the Senators ended in a 21–21 division. Lieutenant Governor C.L. Otter then cast his vote in opposition to the election of Senator Sweeney. The Republicans then placed in nomination for the position the name of Senator Michael Crapo. This vote also ended in a 21–21 tie. Lieutenant Governor Otter then cast the tie breaking vote in favor of Senator Crapo. The members of the Democratic party, through their leader Senator Sweeney, objected to the vote of Lieutenant Governor Otter upon the basis that he is prohibited by the Idaho Constitution from voting on organizational matters of the senate, including the election of its President Pro Tempore. The objection was overruled by the Lieutenant Governor and Senator Crapo was declared elected President Pro Tempore.

On December 7, 1990, the 21 Democratic senators filed a verified petition asking for extraordinary relief in the nature of a writ prohibiting Lieutenant Governor Otter from further involvement in the organization of the Idaho Senate and commanding the Republican senators to comply with the Idaho Constitution as interpreted by petitioners. The petition further requests a writ permanently and absolutely prohibiting Lieutenant Governor Otter from voting on "organizational matters" when a tie vote occurs.

Pursuant to an order of this Court, the respondents filed a response to the verified petition admitting that the Lieutenant Governor cast the tie breaking vote in electing Senator Crapo as President Pro Tempore. The respondents agreed with the petitioners that this Court has jurisdiction to hear this matter and that the issue is of public interest; however, they asserted that petitioners have not met their burden to support the issuance of an extraordinary writ. Further, respondents asserted that the question whether the President of the Senate may cast a tie-breaking vote is an improper subject for judicial review. On December 21, 1990, oral argument was presented to the Court by counsel for the petitioners and respondents.

Petitioners request that this Court accept original jurisdiction in this matter and grant extraordinary relief. This Court has the power to accept original jurisdiction in this matter and issue extraordinary relief in the form of a writ of mandamus, a writ of prohibition, or any writ necessary for the complete exercise of its appellate jurisdiction. Idaho Const. art. 5, § 9. We have exercised this jurisdiction in the past and have provided relief where appropriate. *Cowles Publishing Co. v. Hutchinson,* 118 Idaho 753, 800 P.2d 640 (1990) (writ issued to require magistrate court to open preliminary hearing to the public); *Idaho Falls Redevelopment Agency v. Countryman,* 118 Idaho 43, 794 P.2d 632 (1990) (writ denied); *Eismann v. Miller,* 101 Idaho 692, 619 P.2d 1145 (1980) (writ issued to prevent frivolous *pro se* filings); *Sierra Life Ins. Co. v. Granata,* 99 Idaho 624, 586 P.2d 1068 (1978) (writ issued to compel district court to assume jurisdiction); *Mahler v. Birnbaum,* 95 Idaho 14, 501 P.2d 282

(1972) (writ denied); *Coeur d'Alene Turf Club, Inc. v. Cogswell*, 93 Idaho 324, 461 P.2d 107 (1969) (writ issued to stay ejectment action during appeal); *Miller v. Winstead*, 75 Idaho 262, 270 P.2d 1010 (1954) (writ issued to compel district court to grant petitioner a jury trial); *Keenan v. Price*, 68 Idaho 423, 195 P.2d 662 (1948) (writ issued to require Secretary of State to accept filing of candidacy for political office); *State v. Lukens*, 48 Idaho 357, 283 P. 527 (1929) (writ issued to require Secretary of State to accept and file chattel mortgage). Because the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature, we accept jurisdiction in this case to review the petition for extraordinary relief.

### ISSUE

Does the Lieutenant Governor violate the separation of powers clause of the Idaho Constitution by voting during the Senate's organizational session when the vote is equally divided?

### STANDARD OF REVIEW

Petitioners' request for relief requires an interpretation and construction of the Idaho Constitution. We note at the outset that "[t]he general rules of statutory construction apply to constitutional provisions generally." *Westerberg v. Andrus*, 114 Idaho 401, 403, 757 P.2d 664, 666 (1988); *Engelking v. Investment Board*, 93 Idaho 217, 221, 458 P.2d 213, 217 (1969) ("[T]he general rules of statutory construction apply to the amendment of a constitution as well as to constitutional provisions generally"); *Lewis v. Woodall*, 72 Idaho 16, 18, 236 P.2d 91, 93 (1951) ("[T]he statutory rules of construction apply to the interpretation of constitutional provisions"); *Keenan v. Price*, 68 Idaho 423, 437, 195 P.2d 662, 670 (1948) ("[G]eneral principles of statutory construction apply to the interpretation of constitutions"); *Higer v. Hansen*, 67 Idaho 45, 52, 170 P.2d 411, 415 (1946) ("The same rules apply to the construction of provisions of the Constitution as apply to construction of statutes"); *Phipps v. Boise St. Car Co.*, 61 Idaho 740,

747, 107 P.2d 148, 151 (1940) ("The general provisions of statutory construction apply to the interpretation of constitutions").

■ When called upon to review legislation, this Court has stated:

"The most fundamental premise underlying judicial review ... is that, unless the result is palpably absurd, the courts must assume the legislature meant what it said. Where a statute is clear and unambiguous the expressed intent of the legislature must be given effect.

*State, Dept. of Law Enforcement v. One 1955 Willys Jeep*, 100 Idaho 150, 153, 595 P.2d 299, 302 (1979). Where a statute or constitutional provision is clear we must follow the law as written. *Moses v. State Tax Com'n*, 118 Idaho 676, 799 P.2d 964 (1990); *State v. Ankney*, 109 Idaho 1, 704 P.2d 333 (1985); *Herndon v. West*, 87 Idaho 335, 393 P.2d 35 (1964); *John Hancock Mutual Life Ins. Co. v. Neill*, 79 Idaho 385, 319 P.2d 195 (1957). Where the language is unambiguous, there is no occasion for the application of rules of construction. *Airstream, Inc. v. CIT Financial Serv., Inc.*, 111 Idaho 307, 723 P.2d 851 (1986); *Ottesen v. Board of Com'rs of Madison County*, 107 Idaho 1099, 695 P.2d 1238 (1985); *Worley Highway Dist. v. Kootenai County*, 98 Idaho 925, 576 P.2d 206 (1978).

We note the venerable words of Chief Justice Marshall in *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 185, 6 L.Ed. 23 (1824) as he spoke about constitutional interpretation and construction:

As men whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said. If, from the imperfection of human language, there should be serious doubts respecting the extent of any given power, it is a well settled rule that the objects for which it was given, especially when those objects are expressed in the instrument itself, should have great influence in the

present case. We know of no reason for excluding this rule from the present case.

*Id.,* 22 U.S. at 188–189.

■ The fundamental object in construing constitutional provisions is to ascertain the intent of the drafters by reading the words as written, employing their natural and ordinary meaning, and construing them to fulfill the intent of the drafters. *Haile v. Foote,* 90 Idaho 261, 409 P.2d 409 (1965); *Keenan v. Price,* 68 Idaho 423, 195 P.2d 662 (1948).

## THE LIEUTENANT GOVERNOR DOES NOT VIOLATE THE SEPARATION OF POWERS CLAUSE OF THE IDAHO CONSTITUTION BY VOTING DURING THE SENATE'S ORGANIZATIONAL SESSION WHEN THE VOTE IS EQUALLY DIVIDED.

■ The separation of powers doctrine embodies the concept that the three branches of government, legislative, executive and judicial, should remain separate and distinct so that each is able to operate independently. This concept of separation of powers was adopted as a guiding principle by the United States government, although not expressly mentioned in the United States Constitution. *O'Donoghue v. United States,* 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933) ("It is important thus to separate the several departments of government and restrict them ..."); *Springer v. Government o Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928); *Evans v. Gore,* 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920), 11 ALR 519, (*overruled* on other grounds *O'Malley v. Woodrough,* 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289, 122 ALR 1379 (1939)); *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *Kilbourn v. Thompson,* 103 U.S. 168, 191, 26 L.Ed. 377 (1881) ("It also remains true, as a general rule, that the powers confided by the Constitution to one of these departments cannot be exercised by another").

Joseph Story, in *Story on the Constitution,* (1873), quotes Charles de Montesquieu, the French philosopher, on the dangers of allowing the three branches to become entwined:

> When ... the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty, because apprehension may arise, lest the same monarch or senate should enact tyrannical laws, or execute them in a tyrannical manner. Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be the legislator. Were it joined to the executive power, the judge might behave with violence and oppression. There would be an end of everything were the same man, or the same body, whether of the nobles or of the people, to exercise these three powers, that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals.

*Id.* at 377.

The framers of the Idaho Constitution saw fit to include this concept in our constitution as an express provision:

> § 1. Departments of government.—The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, *except as in this constitution expressly directed or permitted.*

Idaho Const. art. 2, § 1 (emphasis added).

Petitioners assert that allowing the Lieutenant Governor to cast a tie-breaking vote on "procedural matters" violates the separation of powers doctrine because it results in the executive branch exerting undue influence on the Senate. The separation between the three branches is not always absolute and unequivocal. Joseph Story is instructive on this issue:

> § 525. But when we speak of a separation of the three great departments of

government, and maintain that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. *The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments;* and that such exercise of the whole would subvert the principles of a free constitution.... Mr. Justice Blackstone has illustrated the advantages of an occasional mixture of the legislative and executive functions in the English Constitution in a striking manner. "It is highly necessary," says he, "for preserving the balance of the constitution, that the executive power should be a branch, though not the whole of the legislative. The total union of them, we have seen, would be productive of tyranny. The total disfunction of them, for the present, would, in the end, produce the same effects by causing that union, against which it seems to provide.... Notwithstanding the memorable terms in which this maxim of a division of powers is incorporated into the bills of rights of many of our State constitutions, the same mixture will be found provided for, and indeed required in the same solemn instruments of government.

J. Story, *Story on the Constitution*, p. 380 (emphasis added).

The "mixture" of which Story wrote has been incorporated into our state and federal government structures. The President of the United States participates in the legislative process through the power of his veto. The impeachment power allows restraints on one branch of government by another. G. Gunther, *Constitutional Law* (9th ed. 1975). On a state level, the governor has the power to veto legislation, art. 4, § 10, and to grant pardons, art. 4, § 7. The legislature must ratify certain executive appointees such as the members of the Idaho Water Resource Board, I.C. § 42–1732, members of the State Tax Commission, I.C. § 63–501, members of the Industrial Commission, I.C. § 72–501(1), and members of the Idaho Public Utilities Commission, I.C. § 61–201. Thus, the separation of powers concept is not an all or nothing proposition. The intrusion of one constitutional department of government into the powers of another department is not a violation of the separation of powers clause of the constitution if that intrusion is authorized by the constitution itself.

Article 2, § 1, of the Idaho Constitution contemplates limited interbranch encroachment when it follows the separation of powers pronouncement with the language, "except as in this constitution expressly directed or permitted." We first must determine if the language contained in art. 4, § 13 of the Idaho Constitution constitutes an express authorization, as required by art. 2 § 1, which would allow the Lieutenant Governor to cast a vote in case the Senate is equally divided.

The language of art. 4, § 13 is:

§ 13. Lieutenant Governor is president of senate.—The lieutenant governor shall be president of the senate, *but shall vote only when the senate is equally divided.* In case of the absence or disqualification of the lieutenant governor from any cause which applies to the governor, or when he shall hold the office of governor, then the president pro tempore of the senate shall perform the duties of the lieutenant governor until the vacancy is filled or the disability removed. (Emphasis added).

Black's Law Dictionary defines "express" as, "[c]lear; definite; explicit; plain; direct; unmistakable; not dubious or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. Made known distinctly and explicitly, and not left to inference." *Black's Law Dictionary* (6th ed. 1990). "'Express' means 'manifested by direct and appropriate language.'" *Black's Law Dictionary* 691 (Rev. 4th ed. 1968). *Messmer v. Ker*, 96 Idaho 75, 80, 524 P.2d 536, 541 (1974).

The language in art. 4, § 13 of the Idaho Constitution, "[t]he lieutenant governor shall be president of the senate, but shall vote only when the Senate is equally divided," is a clear expression by the framers of our constitution allowing the Lieutenant Governor to vote whenever the Senate is equally divided. The historical precedent in this area bolsters our holding that the powers specifically enumerated in art. 4, § 13 do not violate the separation of powers clause of art. 2, § 1. In *Story on the Constitution*, Joseph Story comments on a closely analogous situation:

§ 737. There is no novelty in the appointment of a person to preside as speaker who is not a constituent member of the body over which he is to preside. In the house of lords, in England, the presiding officer is the lord chancellor or lord keeper of the great seal, or other person appointed by the king's commission; and if none such be so appointed, then it is said that the lords may elect. But it is by no means necessary that the person appointed by the king should be a peer of the realm or lord of Parliament. Nor has this appointment by the king ever been complained of as a grievance, nor has it operated with inconvenience or oppression in practice. It is, on the contrary, deemed an important advantage both to the officer and to the house of peers, adding dignity and weight to the former, and securing great legal ability and talent in aid of the latter. This consideration alone might have had some influence in the convention. The Vice–President being himself chosen by the States, might well be deemed, in point of age, character and dignity, worthy to preside over the deliberations of the Senate, in which the States were all assembled and represented. His impartiality in the discharge of its duties might be fairly presumed; and the employment would not only bring his character in review before the public, but enable him to justify the public confidence, by performing his public functions with independence and firmness and sound discretion. A citizen who was deemed worthy of being one of the competitors for the Presidency, could scarcely fail of being distinguished by private virtues, by comprehensive acquirements, and by eminent services. In all questions before the Senate he might safely be appealed to as a fit arbiter upon an equal division, in which case alone he is intrusted with a vote.

*Id.* at 524 (footnotes omitted).

The source of the American governmental concept of a non-legislative person presiding over the Senate and having a casting vote originates with the New York constitution drafted in 1777.

XX. That a lieutenant-governor shall, at every election of a governor, and as often as the lieutenant-governor shall die, resign or be removed from office, be elected in the same manner with the governor, to continue in office until the next election of a governor; and such lieutenant-governor shall, by virtue of his office, be president of the senate, and, upon an equal division, have a casting voice in their decisions, but not vote on any other occasion.

N.Y. Const. of 1777, art. XX.

The Lieutenant Governor does not violate the constitutional separation of powers as set forth in art. 2, § 1, by voting when the Senate is equally divided unless there are other constitutional limitations upon that power. We must then consider if there are other constitutional limitations placed upon the matters on which the Lieutenant Governor may cast a tie-breaking vote.

The New York Constitution was the inspiration for article I, § 3 of the United States Constitution, drafted in 1787, which expressly provides, "The vice-president of the United States shall be president of the senate, but shall have no vote, unless they be equally divided." The United States Senate has interpreted this authority of the Vice–President to vote when they (the Senate) are "equally divided" on both legislative and organizational matters:

The Vice President not only votes in the case of legislative matters, but also in the case of the election of an officer of the Senate or confirmation of executive nominations, he may vote in the case of a

tie on the question as to the right of a Senator-elect to be seated as a Senator. *Senate Procedure Precedents and Practices,* S.Doc. No. 44, 88th Cong., p. 706, (footnotes omitted).

Petitioners point out that the Vice President of the United States typically is voluntarily absent during the organizational proceeding of the United States Senate. We acknowledge this custom of the United States Senate but do not find it to be of constitutional origin or precedent.

The drafters of the Montana Constitution in 1889 modeled art. 7, § 15 of their constitution after the New York and United States Constitutions and made their Lieutenant Governor president of the Senate with a tie breaking vote. The Montana Supreme Court determined that this provision applies to both legislative and organizational matters. *State ex rel. Easbey v. Highway Patrol Bd,* 140 Mont. 383, 388, 372 P.2d 930, 935 (1962).

In the summer of 1889, the framers of the Idaho Constitution drafted a provision virtually identical to that contained in art. 7, § 15 of the Montana Constitution. We are fortunate enough to have evidence of the intent of the framers in adopting art. 4, § 13 of our constitution:

> Mr. McConnell—It occurs to me that we have more offices described here than is necessary for a state of our size and prospective wealth. We have, namely, a Governor, Lieutenant Governor, Secretary of State, Auditor, State Treasurer, Attorney General, and Superintendent of Public Instruction. I think for a term of years at least we could easily dispense with either of these officers, namely, the Lieutenant Governor, State Auditor or Attorney General.

> Mr. Ainslie, delegate from Boise County, who was the chair of the standing committee on the Executive Department of the Constitutional Convention—the committee which drafted Article 4 of the constitution—responded to the argument of Mr. McConnell.

> Mr. Ainslie—The Lieutenant Governor derives no salary from the State Treasury, except when he is in actual service

as presiding officer of the senate; it is so provided, and then he only draws the same rate that the speaker of the house of representatives does, during the time it is in session. During the balance of the year he draws no pay at all, *and he has no vote, except in case of a tie in the senate.* I think the office is a necessary one, and the committee unanimously believe so or they would not have so reported it.

*Proceedings and Debates of the Constitutional Convention,* Vol. I, p. 412 (I.W. Hart ed. 1912) (emphasis added).

This colloquy makes it evident that the drafters intended the Lieutenant Governor to vote in the case of a tie, and included a clause in art. 4, § 13 in the Idaho Constitution for that reason. Article 4, § 13 does not restrict the questions on which the Lieutenant Governor may cast this tie-breaking vote.

1990 is not the first time in the history of the state of Idaho that the Lieutenant Governor has exercised this power to vote when the Senate is equally divided. During the 21st legislative session held in 1931, the Senate consisted of 23 republicans and 21 democrats. Tie votes occurred three times during that session, and the Lieutenant Governor cast the deciding vote to break each of the ties. These votes were for the elections of attaches, journal clerk and Sergeant at Arms—all organizational matters. S.J., 1931 Legislative Session, p. 5–8.

In 1967, I.C. § 67–404a was passed, for the first time separating an organizational session from the regular session of the Idaho legislature. This procedure was not part of the legislative process designed by the drafters of the Idaho Constitution in 1889, and it is not helpful in analyzing the purpose of the tie-breaking purpose provided in art. 4, § 13. Whether the organizational session is separate, as I.C. § 67–404a provides, or merely the first stage of the legislative session, as it was prior to 1967, the Lieutenant Governor's authority to vote in the case of a tie vote is the same.

These historical precedents all support an interpretation of art. 4, § 13 permitting

the Lieutenant Governor to vote when the Senate is equally divided on any matter.

Petitioners urge that the organizational and rule-making provisions of Idaho Const. art. 3, § 9 limits the involvement in organizational matters to members of each house, therefore, precluding the Lieutenant Governor from taking part in the organization of the senate.

■ The predicate for petitioners' position in relation to art. 3, § 9, of the Idaho Constitution, is that the Senate does not exist until it is organized, and therefore, the contemplation of art. 3, § 9, is that only those who have been elected to positions in the Senate have the franchise to cast a vote to "organize the Senate" and thus bring it into being.

Petitioners argue that there is no Senate until after rules have been established, the President Pro Tempore and other officers have been elected, committees have been appointed and committee chairs have been designated. The *Journal of the First Session of the Legislature of the State of Idaho*, held in Boise City, Idaho, on December 8, 1890, reflects a different understanding of when the Senate comes into existence:

At the hour of 12 o'clock noon, on Monday, the 8th day of December, A.D. 1890, being the day and hour designated in the proclamation of the Governor of the State convening the legislature of the State of Idaho for the first session, the *members elect of the senate* assembled in the senate chamber of the capitol, at Boise City, and were called to order by Lieutenant-Governor Norman B. Willey, President of the senate.

After prayer by the Rev. Skidmore.

Mr. Gunn moved that M.C. Athey be elected secretary of *the senate* pro tem.

The President then read the proclamation of the Governor convening the legislature of the State of Idaho at Boise City on the 8th day of December, 1890.

The president of *the Senate* then called the roll of members, as certified by the Secretary of State, and the following named gentlemen responded to their names:

. . . .

The oath of office was then administered to *the senators-elect* by Mr. Justice Sullivan, Chief Justice of the supreme court of the State of Idaho.

Mr. Gray moved that *the senate* adjourn until 2:30 o'clock p.m. of this day. The motion carried, and the President of *the senate* declared *the senate* adjourned until half past two o'clock this afternoon.

*Senate met* pursuant to adjournment at 2:30 o'clock p.m., the Lieutenant Governor presiding.

The roll was called and *all the senators* were present.

Mr. Shoup moved that a committee of five be appointed by the chair to report rules for the government of *the senate*. The motion was carried.

Mr. Gray moved that the rules of the legislative council of the fifteenth session be adopted, so far as consistent, for the regulation of *the senate* until the report of the committee on rules be adopted. The motion was carried.

Mr. Brigham moved that *the President appoint a committee* of three on organization to designate and determine the number and order of offices to be filled *by the senate*. The motion was carried.

The President of *the senate* then announced the following committees:

Committee on rules of government of *the senate*, Messrs. Shoup, Weller, Langrishe, Gray and Branstetter.

Committee on organization, Messrs. Brigham, Gunn and Jewell.

Mr. Finch moved that in drawing for seats that the names be placed in a hat and the first name drawn should take seat No. 1 and so on.

Mr. Gunn moved to amend the motion by adding that *the senators* retain the seats they now occupy, which motion prevailed.

Mr. Wells moved that *the senate* adjourn until tomorrow at ten o'clock a.m., which motion prevailed.

*The senate* adjourned.

(Emphasis added.)

This record makes it clear that the members of the first Senate knew the Senate

came into existence when they were sworn in. It is worthy to note historically, that the motion that the "Senate adjourn until 2:30 p.m." was made by Mr. John S. Gray, Senator from Ada County, who was a lawyer-member of the committee at the Constitutional Convention which drafted art. 4, § 13. Senator Gray was present in the chambers while the Lieutenant Governor presided over the organizational meeting of the senate, and in fact, appointed the committees to select the number of officers and composition thereof.

Petitioners further assert that art. 3, § 10 of the Idaho Constitution, which provides that if either house remains unorganized after four (4) days the house members will not receive pay until it becomes organized, is the sole remedy for a deadlock in the Senate. Petitioners suggest that the original drafters must have intended art. 3, § 10 to provide legislators with sufficient incentive to resolve a deadlock and that neither § 9 nor § 10 of art. 3 of the Idaho Constitution expressly provides that the Lieutenant Governor may vote in organizational matters:

§ 9. **Powers of each house.**—Each house when assembled shall choose its own officers; judge of the election, qualifications and returns of its own members, determine its own rules of proceeding, and sit upon its own adjournments; but neither house shall, without the concurrence of the other, adjourn for more than three (3) days, nor to any other place than that in which it may be sitting.

§ 10. **Quorum, adjournments and organization.**—A majority of each house shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may compel the attendance of absent members in such manner and under such penalties as such house may provide. A quorum being in attendance, if either house fail to effect an organization within the first four (4) days thereafter, the members of the house so failing shall be entitled to no compensation from the end of the said four (4) days until an organization shall have been effected.

Petitioners assert that these provisions restrict the authority granted in art. 4, § 13 because the Lieutenant Governor is not expressly granted any recognition in these articles.

■ It is our duty to reconcile constitutional provisions that apparently conflict with one another. *Standlee v. State*, 96 Idaho 849, 852, 538 P.2d 778, 781 (1975) ("Constitutional provisions apparently in conflict must be reconciled if at all possible"); *Engelking v. Investment Board*, 93 Idaho 217, 221, 458 P.2d 213, 217 (1969) ("[P]rovisions apparently in conflict must be reconciled"); *Christensen v. West*, 92 Idaho 87, 88, 437 P.2d 359, 360 (1968) ("Statutes *in pari materia* [pertaining to the same subject matter], although in apparent conflict, are so far as reasonably possible construed to be in harmony with one another"); *Tway v. Williams*, 81 Idaho 1, 336 P.2d 115 (1959). Therefore, we must determine if there is a conflict among these various constitutional provisions.

It is apparent that the drafters of our constitution envisioned various contingencies that would prevent the efficient operation of our legislature. Because certain events could stall the legislature and prevent the transaction of necessary business, the drafters of our constitution included several provisions to alleviate potential problems.

As the report of the Constitutional Convention bears out, the drafters of our constitution were concerned with the possibility of the Senate ending in a tie. For that reason, they gave a deciding vote to the President of the Senate in order to break a deadlock that resulted from an equally divided Senate. Without such a provision, the Senate would remain in deadlock and nothing would be accomplished. This would frustrate the purpose of the Senate.

■ But an equally divided Senate is not the only contingency the drafters contemplated. Those who framed our constitution were aware of many other exigencies that could arise that would prevent the Senate from organizing itself. Such as a lack of a quorum, filibustering, dilatory legislators, legislators who would not vote, an absent

or recalcitrant President of the Senate, and other eventualities that could keep the Senate from organizing. These situations could not all be solved by giving the Lieutenant Governor a deciding vote. Article 3, § 10 was included in Idaho's Constitution as an additional remedy. Together, Idaho Const. art. 3, § 9, art. 3, § 10, and art. 4, § 13, function to provide a framework for the efficient operation of the Senate. There is no conflict among these constitutional provisions, as neither art. 3, § 9 nor art. 3, § 10 limits, restricts or modifies the authority for the Lieutenant Governor to vote when the Senate is equally divided as expressly granted in Idaho Const. art. 4, § 13. To hold that the grant of authority to the Lieutenant Governor to vote when the Senate is equally divided must be repeated in each constitutional section dealing with the authority of the Senate to act, would render the authority conferred in art. 4, § 13 meaningless. Although this expressly stated authorization is not restated elsewhere, the authority of the Lieutenant Governor to vote when the Senate is equally divided, as expressly established in art. 4, § 13, is not inconsistent with art. 3, § 9 or § 10.

## SENATE RULES

The parties urge us to analyze the Senate Rules as affecting the outcome of the issues presented, and as to whether the appellate process provided for in those rules are an adequate remedy, thereby precluding the availability of an extraordinary writ to the petitioners.

In *Bietelspacher v. Risch*, 105 Idaho 605, 671 P.2d 1068 (1983), we stated:

Our state Constitution, Art. 2, § 1, divides our government into three distinct departments and forbids members of one department, for example the judiciary, from exercising powers properly belonging to one of the other departments, such as the legislature. Art. 3, § 9, of our Constitution gives each house of the legislature the power to determine its own rules of proceeding. Thus, this power is specifically reserved to the legislative branch by the Constitution, and we cannot interfere with that power. The interpretation of internal procedural rules of

the Senate is for the Senate. Its leadership has spoken, and the Senate as a whole has not overruled it.

*Id.* 105 Idaho at 606, 671 P.2d at 1069.

Having addressed the constitutional issues involved, we decline to review the Senate Rules.

## CONCLUSION

After reviewing the petition for extraordinary relief we hold that the Lieutenant Governor did not violate the separation of powers clause of art. 2, § 1 by voting pursuant to art. 4, § 13. We hold that Idaho Const. art. 4, § 13 authorizes the Lieutenant Governor to vote any time the Senate is equally divided. We hold that art. 3, § 9, art. 3, § 10 and art. 4, § 13 of our Constitution were designed to function together to ensure that our Senate functions efficiently and productively. Therefore, we deny the petition.

No costs to either party.

BAKES, C.J., JOHNSON, J., and SCHROEDER, J., pro tem.

BISTLINE, Justice, dissenting:

The opinion for the court is well-written, and resulted from a truly collegial effort. It is persuasive, but I cannot in good conscience join it. In eighth grade civics class I learned that the Lieutenant Governor was an office created by the framers of the Idaho Constitution so, that on the happening of the elected governor dying, or otherwise being disabled from continuing in office, there would be a successor in place, ready to step in and take over.

Whoever holds that office, so we learned, does have the Constitutional right to vote in circumstances where the Senate is equally divided—should the question before the Senate be in regard to the legislative process of enacting *laws.*

The philosophy behind the procedure, so we learned, was that a tie vote would result in needed legislation being delayed. We further were given to understand that, although the office-seeker is of some particular chosen party, once elected to the office, party affiliation is eschewed the very minute she/he is administered the oath of office.

That oath is much like any oath of office, including that of a justice. There is nothing therein which declares fealty to a political party. The seated Lieutenant Governor is on a par with judges and justices, who along with the Lieutenant Governor—by reason of accepting office of high trust—the officers are implicitly foreswearing loyalty to any political party, but have entered into an undertaking to represent the people of Idaho. As a known fact it is not just Republicans who participate in elections, but included also are some Idaho citizens who are not Republicans, and who yet place their faith in the person who seeks elective state office. The holder of any state public office is beholden to the State of Idaho and its people. It is the office which has the power to act, *not* the holder of the office.